PEOPLE *v.* HAWTHORNE.

1. CRIMINAL LAW—ATTORNEY AND CLIENT—PRIVILEGED COMMUNICATIONS.

In prosecution for homicide where defendant, upon cross-examination, was asked whether or not he had disclosed to his counsel that he had ''heard some officers or somebody whisper to the prosecutor'' while a statement was being taken from defendant at police headquarters, trial court's failure to sustain objection to making of answer thereto was not reversible error where answer made did not disclose that a privileged communication had been made.

2. SAME—TRANSCRIPT OF TESTIMONY—EVIDENCE OF CORPUS DELICTI.
   In prosecution for homicide, claim of error in the introduction of a transcript of testimony taken at the examination of defendant in the absence of the witness testifying therein, and without a showing that the witness was not available or when, where, by whom, and under what circumstances the transcript was taken and transcribed, and that because without such transcript the *corpus delicti* was not properly shown, *held*, untenable, where witness was the doctor who had performed autopsy upon slain man, there was evidence that doctor had been confined to his bed and had told a witness he had collapsed in his office, and it is admitted that defendant shot a man who fell to floor and then shot several more bullets into the body.

3. INDICTMENT AND INFORMATION—INDORSEMENT OF NAMES OF WITNESSES—RES GESTAE.
   Refusal of trial court to indorse upon the information the name of person claimed to be a *res gestae* witness was not reversible error where not only was no showing made that such witness was a *res gestae* witness but examination of the record would indicate she was not such a witness.

4. SAME—COMMON-LAW FORM—BILL OF PARTICULARS—DISCRETION OF COURT.
   Conviction of manslaughter is affirmed notwithstanding court refused to order prosecuting attorney to furnish a bill of particulars where the information was the common-law form as the common law governs when the common-law form of information is used and ordering a bill of particulars under such circumstances is discretionary with the court.

5. CRIMINAL LAW—HOMICIDE—PREJUDICIAL ARTICLE IN OPEN NEWSPAPER IN JURY ROOM PENDING TRIAL.
   Claimed error in prosecution for homicide in that an open newspaper containing a very prejudicial article on the case was found in the jury room pending the trial *held*, not reversible, where court, upon discovery of the incident, polled and interrogated each juror as to whether he had read such article and each answered that he had not read that or any other newspaper article about the case.

6. SAME—QUALIFICATIONS OF EXPERTS—DISCRETION OF COURT.
   The determination of whether a witness has the qualifications of an expert is a question for the trial judge and his discretion in the matter is only interfered with by the Supreme Court in the event it is abused.

7. SAME—NONMEDICAL EXPERT WITNESS.

If a witness be in reality an expert upon any given subject belonging to the domain of medicine, his opinion may be received by the court, although he has not a license to practice medicine, but such testimony should be received with great caution and only after the trial court has become fully satisfied that upon the subject as to which the witness is called to give an opinion he is fully competent to do so.

8. SAME—NONMEDICAL EXPERT WITNESS—QUALIFICATIONS.

When a nonmedical person is offered as an expert on subjects in the orbit of medical science, the trial court is put on guard and should take greater precaution in the preliminary inquiry to determine the witness's qualifications and the extent of his knowledge than might be necessary when a graduate of a medical school is proposed.

9. SAME—PREJUDICIAL ERROR—WITNESSES.

In prosecution for homicide in which defendant claimed defense of insanity and sought to support it by testimony of a nonmedical person as an expert witness, prejudicial effect of court's error, if any, in sustaining objection to competency of the witness as an expert on insanity was removed when court gave defense an opportunity to recall the witness to testify as to any observations while in contact with defendant and any conclusions based on such observations.

10. SAME—HOMICIDE—INSANITY—WITNESSES.

In prosecution for homicide, a professor of psychology at a college who had given six courses taken by defendant and had had further contact with defendant on numerous trips in connection with athletic activities was a competent witness to state conclusions as to defendant's alleged insanity based on his own observations of the facts relating to the case.

POTTER, CHANDLER, and McALLISTER, JJ., dissenting in part.

Appeal from Recorder's Court of the City of Detroit; Murphy (George), J. Submitted January 11, 1940. (Docket No. 117, Calendar No. 40,384.) Decided April 1, 1940.

William Hawthorne was convicted of manslaughter. Affirmed.

*Herbert E. Munro,* for defendant.

*Thomas Read,* Attorney General, *Duncan C. Mc-Crea,* Prosecuting Attorney, and *William L. Brunner, John A. Ricca,* and *Charles W. Jones,* Assistants Prosecuting Attorney, for the people.

McAllister, J. On trial before a jury, defendant was convicted of manslaughter in the killing of John Barrett. He appeals, assigning error on grounds of improper cross-examination, denial of a request to indorse on the information the name of a *res gestae* witness, refusal to permit expert testimony, errors in the admission of evidence, denial of a motion for a bill of particulars, and order denying new trial.

Defendant had secretly married his wife, Catherine. John Barrett had known the young woman for several years and was friendly with her. They had previously planned to marry. Barrett found out that she was secretly married, but was told by her that she had never lived with her husband as man and wife, and that the marriage was to be annulled or a divorce obtained. Defendant thereafter met Barrett and told him that if he went around with his wife again, he would kill him. Finally, a meeting between defendant, his wife, and Barrett was arranged at the home of Barrett's mother. In the presence of Barrett's mother, defendant asked Barrett if he cared enough about Catherine to marry her, if a divorce were granted, and asked Catherine if she loved Barrett enough to marry him. Upon being answered by both affirmatively, defendant mentioned that he wished to go into the kitchen for a glass of water. Shortly thereafter, he returned to the living room with two revolvers in his hands. He immediately shot Barrett; then shot his wife. He then stood over their bodies and proceeded to

fire bullets into them until his revolvers were empty. He wanted to be sure of their deaths. Afterward, he surrendered to the police, and, on trial, his defense was insanity.

After testifying in his own behalf, defendant, upon cross-examination, was asked by the prosecuting attorney whether he had told his counsel that he "heard some officers or somebody whisper to the prosecutor" while a statement was being taken from defendant at police headquarters. Numerous objections to such question were made by defendant's counsel on the ground that communications to counsel were privileged. The trial court overruled the objections. Defendant then answered that he had told his counsel everything about the case; that he did not remember any particular statement, and that he did not know whether he had advised his counsel of such whispered conversations; that he would not say that he might have, or might not have, so informed his lawyer. Since no answer was made revealing disclosure of any privileged communication, and the bearing of this controversy upon the case was of practically no relevance, we fail to see, under the circumstances, that the action of the trial court in not sustaining objections by defendant's counsel resulted in any prejudicial reversible error.

Under the defense of insanity, defendant's counsel introduced in evidence the testimony of a physician, who testified as an expert, and several lay witnesses, who testified with regard to their opinions of defendant's insanity from observations of his conduct and actions. Defendant had the benefit of such testimony in support of his defense of insanity. Counsel, however, also sought to qualify, as an expert witness on insanity, a professor from the Michigan State Normal College. Such witness was not a practicing physician nor a graduate of a medical college.

He had never treated insanity nor was he licensed to practice medicine in any form. His qualifications, as submitted to the court, were that he had received degrees of bachelor of arts, master of arts, bachelor of divinity, doctor of philosophy, and doctor of psychology; that he had studied at eight different colleges and had taught at four; that he gave courses in general psychology, and had written books and articles on the subject; and that he had given "mental tests." Insanity, however, is held to be a disease, *In re Petition of Crosswell*, 28 R. I. 137 (66 Atl. 55, 13 Ann. Cas. 874), and, therefore, comes within the realm of medical science, which comprises the study and treatment of disease. Only physicians can qualify to answer hypothetical questions as experts in such science. The court was not in error in excluding the testimony sought to be offered.

Error is assigned in that the court permitted the introduction of a transcript of testimony taken at the examination of defendant, in the absence of the witness testifying therein, and without a showing that the witness was not available; and also in the absence of showing when, where, by whom, and under what circumstances, the transcript was taken and transcribed. The testimony was that of Dr. Drolshagen, who performed an autopsy on the body of the slain man. The witness was ill at the time of the trial. A police lieutenant testified that the doctor was confined to his bed, and that the doctor had told the witness he had collapsed in his office. No objection was made to this testimony. No specific objection was made by the defense on the ground of failure to show the circumstances attending the taking of the testimony. It is claimed that because of the erroneous introduction of the transcript, the *corpus delicti* was not properly shown. There was no dispute that defendant shot John Barrett; that Barrett fell to the floor; that defendant then stood

over him and shot several more bullets into his body; and that aside from being turned over by his mother, the body lay there until it was removed by the coroner. We fail to see any merit in defendant's contention.

The trial court did not err in refusing defendant's request to indorse upon the information the name of Veronica Fox as a *res gestae* witness. There is no showing, nor does it appear from anything in the record, that the person sought to be so indorsed was a *res gestae* witness; in fact, from our examination of the case, the contrary appears; and the refusal of defendant's request was not erroneous.

We are further of the opinion that there was no error in refusing to order the prosecutor to furnish a bill of particulars. The information was the common-law form. The common-law governs when the common-law form of information is used, and ordering a bill of particulars under such circumstances is discretionary with the court.

Error is further assigned on the ground that an open newspaper containing an account of the case was found in the jury room pending the trial, and that the article was of such a prejudicial nature that its effect could not be cured by the charge of the court. When such incident was discovered during the trial, the judge polled and interrogated each juror as to whether he had read the article about the case in the newspaper referred to, or whether he had read any articles published about the case. Each juror answered that not only had he not read the article in question, but further that he had not read any newspaper articles about the case. In this regard, there was no error.

Judgment affirmed.

Potter and Chandler, JJ., concurred with McAllister, J.

BUTZEL, J. I concur in affirmance, but I cannot agree with the proposition of my brother McALLISTER that because insanity is a disease and comes within the realm of medical science that only physicians are competent to answer hypothetical questions on behalf of a defendant in a criminal case. The law does not require a rule so formal, and I do not think we further the cause of justice by insisting that only a medical man may completely advise on the subject of mental condition. The proposed witness was a graduate of Tilton School in New Hampshire, Wesleyan University, Yale University, and Harvard Foundation, and held the degrees of Bachelor of Arts, Master of Arts, Bachelor of Divinity, and Doctor of Philosophy in Psychology. As a graduate student he had attended the University of California, Columbia University, Boston University, Harvard University Medical School, and the Boston Psychopathic Hospital. He was a full professor of Central College, Fayette, Missouri; Baker University; University of Kansas, and Michigan State Normal College; he had been connected with the latter institution for 11 years up to the time of the trial. He had given courses in normal and abnormal psychology, experimental psychology, educational psychology, mental tests and measurements, psychology and criminology, problems in marriage and family, and problems of child-welfare. One of his texts has been through five editions since the first publication in 1927. He has written articles on the subject of human behavior that have appeared in publications throughout the United States. He specialized in the particular field of psychology devoted to motivation and motives of human conduct. He had no medical degree and, of course, could not practice medicine, though he knew about the anatomy of the brain, having studied phys-

iological psychology and neurology. He had given insanity and diseases of the brain special study. I do not think it can be said that his ability to detect insanity is inferior to that of a medical man whose experience along such lines is not so intensive.

The determination of the qualifications of an expert is a question for the trial judge and we entrust the matter to his discretion. We interfere only to correct an abuse. *McEwen* v. *Bigelow,* 40 Mich. 215; *Ives* v. *Leonard,* 50 Mich. 296; *People* v. *McQuaid,* 85 Mich. 123; *People* v. *Kimbrough,* 193 Mich. 330. No case has been called to my attention where a general medical training has been held to be the *sine qua non* of the competency of a trained specialist to advise on the matter of insanity. In *Evans* v. *People,* 12 Mich. 27, it was held that a nonmedical witness was erroneously permitted to state that there had been no cases of a particular disease in the neighborhood, to rebut opposing medical witnesses who claimed that there was an epidemic of the particular disease. Justice CAMPBELL wrote that "it often happens that some persons having no general skill become very familiar with particular subjects." "It would be very unwise," he said, "to exclude such evidence merely because the range of the witness's knowledge is limited. There are as many grades of knowledge and ignorance in the professions as out of them. The only safe rule in any of these cases is, to ascertain the extent of the witness's qualifications, and within their range, to permit him to speak." The question and its answer were held improper because the witness was not shown to have any knowledge of the disease in question. In *Fox* v. *Peninsular White Lead & Color Works,* 92 Mich. 243 (16 Am. Neg. Cas. 66), it was held that a witness who was not a physician or graduate of any medical school but who had given "a good deal of attention

to chemistry'' and had studied for 15 years the effect of certain chemicals on men working with them could state what his observations had been as to the cutaneous diseases which resulted therefrom. In *People* v. *Rice,* 159 N. Y. 400 (54 N. E. 48), the court said:

"After a careful consideration of the subject we have reached the conclusion that if a man be in reality an expert upon any given subject belonging to the domain of medicine, his opinion may be received by the court, although he has not a license to practice medicine. But such testimony should be received with great caution, and only after the trial court has become fully satisfied that upon the subject as to which the witness is called for the purpose of giving an opinion, he is fully competent to speak. The witness Fenner was not *prima facie* competent, for he had not been licensed to practice medicine. It was essential, therefore, to prove him to be an expert before the defense acquired the right to have him testify as to the sanity or insanity of the defendant.''

The statement might perhaps be challenged as dictum because it was found that the knowledge was in fact inadequate, but I think the expression is sound law. In *Hamilton* v. *United States,* 26 App. D. C. 382, the trial judge did not permit a hospital steward at a jail who had attended medical lectures but was not a graduate to testify as an expert on insanity, and his ruling was affirmed on the ground that the determination of competency was for the discretion of the trial court and that he had not abused his authority by excluding the witness. The case does not decide that in all situations a nonmedical without personal observation of the facts is unqualified to advise the court on questions of insanity. When a nonmedical is offered as an expert on sub-

jects in the orbit of medical science, the trial court is put on guard and should take greater precaution in the preliminary inquiry to determine the witness's qualifications and the extent of his knowledge than might be necessary when a graduate of a medical school is proposed. Yet it may well be that for some purposes, as where the issue concerns proper medical treatment, even a licensed physician would not possess sufficient knowledge in a particular branch of his calling to satisfy a trial judge who, within discretionary limits, insists upon a high standard of reliability. There is no magic in particular titles or degrees and, in our age of intense scientific specialization, we might deny ourselves the use of the best knowledge available by a rule that would immutably fix the educational qualifications to a particular degree.

Nevertheless, I concur in the result reached by Mr. Justice McALLISTER. If error there was in sustaining the objection to the competency of the witness, its prejudicial effect was removed when the court gave the defense an opportunity to recall the witness to testify as to any observations while in contact with the defendant and any conclusions. The witness had known the defendant as a college student who had taken six of his courses and had been with him on numerous occasions on trips in connection with athletic activities. He could still testify as an expert and state conclusions based on his own observation of the facts relating to the case (*Kelley v. Richardson,* 69 Mich. 430; *People v. Ferris,* 283 Mich. 699; *People v. Zabijak,* 285 Mich. 164), and from a practical point of view his conclusions based on his personal acquaintance coupled with a keen, trained understanding of the human mind might carry greater weight with the jury than might his

conclusions based on a hypothetical question without any personal knowledge of the facts. Defendant did not avail himself of the privilege offered; therefore, the error was at most a technical one, and I cannot say that defendant was denied the benefit of his proofs to any prejudicial extent.

BUSHNELL, C. J., and SHARPE, NORTH, and WIEST, JJ., concurred with BUTZEL, J.