[Crim. No. 6007. Second Dist., Div. One. Dec. 19, 1957.]

THE PEOPLE, Respondent, v. SILVERIO SALVATORE SPIGNO, Appellant.

*Assigned by Chairman of Judicial Council.

Kenneth Cleaver for Appellant.

Edmund G. Brown, Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from a judgment wherein the appellant was convicted of violating the provisions of section 288 of the Penal Code.

In an information filed in Los Angeles County, it was charged that the defendant did, on or about July 17, 1956, commit a lewd act upon the body of Sandra L. Steiner, a child of the age of 9 years, with the intent of arousing, appealing to and gratifying the lusts, passions and sexual desires of the child and of the defendant. Following defendant's plea of not guilty, the case was tried and a jury was unable to reach a verdict. The court declared a mistrial. The case was tried a second time and on December 27, 1956, defendant was found guilty as charged.

Doctors were appointed under the provisions of section 5504 of the Welfare and Institutions Code to examine the defendant and to report their findings to the court. A probation officer's report was filed. The court, on February 13, 1957, ordered the proceedings suspended and found, on the basis of the doctors' report, the defendant to be a possible sexual psychopath and committed him to a state hospital for a period of not to exceed 90 days for observation and diagnosis, as provided for in the statutes. On May 6, 1957, the report of the superintendent of the hospital was filed. The report set forth:

"In my opinion said person is not a sexual psychopath and

he is not a menace to the health and safety of others as such. This man suffers from no personality disorder which predisposes him to sexual offenses. The incident with the child is isolated, out of character and not representative of pedophilic desire."

On May 28, 1957, the defendant was returned into court and sentenced to the state prison. The sentence was then suspended and probation granted for five years, the defendant to pay a fine of $500, abstain from alcoholic beverages, not associate with children, except his own, unless in the presence of adults, and maintain employment and obey all laws. The appeal is from the judgment.

A résumé of the facts is as follows: The child, aged 9½ years, lived at an address in Los Angeles which was across an alley-way from the house in which the defendant lived. The child first saw the defendant during the summer of 1956, while walking along a sidewalk on her way to a girl friend's home, which was in the same court as the defendant's residence. The child testified that on that occasion she saw Spigno standing by his back door which was opened 8 to 18 inches, attired in a T-shirt only; that appellant said "Hi" and she answered "Hi." The child also testified that about a week later she saw the appellant in the same position at the same door with the same opening, and that he was attired as before. She stated that about a week after seeing Spigno on the second occasion, while on her way to a boy friend's house, at about 5 o'clock p. m., she saw Spigno again, and on this occasion he said, "Hi," and asked her if she wanted to come into his house to see his parakeets. She said he was attired as she had seen him on the two previous occasions; that he was standing in the open door as before and that she saw his penis; that she then went into the house through the door, and on into the living room to see the parakeets. The child related that appellant then came into the living room with no clothes on; that she sat down on a couch and that he then pulled down a blind on the door or the window and sat down on the couch with her. She stated that he then took her hand and placed it upon his penis, whereupon she immediately went home and told her 12-year-old sister what had occurred, and a short time later told her mother. The mother then told the child's father of the episode.

The defendant was arrested about 1 a. m. on July 18, 1956, and was told that he was being arrested for "child molesting, that there was a complaint signed against him by a little

girl that had been there that afternoon." In the court proceeding there was testimony by the police officers that on the occasion of the arrest the appellant told his wife that the officers were going to take him to the station, to which she replied, "What have you done wrong this time?" to which appellant replied that he had "had a little girl in there that afternoon, and that was all, and that she must have gone home and said something." An officer's testimony continued: "She wanted to know what the charge was. . . . That this little girl had said she had been molested, or that he had bothered her, something to that effect, and my partner told her, yes, it was for child molesting, and she said, 'I know this man, I am married to him, he is not a child molester.' "

The defendant was then taken to the police station where there was a conversation between the officers and the defendant. The officer testified as follows:

". . . he said that this little girl had been out there playing with a kitten, and he had invited her into the house to see the parakeets. I asked him if he had pulled any blinds down and he said, yes. I asked him why, and he said to keep the sun out of her eyes, and I asked what he was wearing and he told me he was wearing a pair of pants,—I believe he said some of his army pants, and that he had a T-shirt on, and I asked him whether the pants were zipped up, and all he said was that he kept the top button open and partly unzipped because they were too small, but he said that was all. He said, 'You probably think I actually did this?' and I told him it was hard for me to believe that a 9-year-old girl would make up a story that follows the normal pattern that we find in most of these cases, where they are told not be afraid, and how they are invited in on the pretense of looking at something, . . . [Defendant stated] 'No, I don't believe that a girl that age would know anything about sex.' "

The appellant testified in his own behalf and stated that he had seen the child three or four times in the neighborhood and that he did say "Hi" to her, the same as he did to anyone else around the place; that he never had stood at the partly opened back door, as the child had related, clothed only in a T-shirt. He related that on July 17th, he had gone fishing about 6 o'clock a. m., and had returned to his residence about 1 o'clock p. m. Mrs. Spohrer, a neighbor who was acting as a baby sitter for his children during his absence was there, and after he had conversed with her a bit, he permitted his children to go out into the yard to play. Mrs. Spohrer

left and he then did some housework and family washing, took a bath and changed into clothes which consisted of some army pants, shoes and stockings. While he was at the back door, the child came by and he asked her if she would like to see the parakeets he had purchased for his children. He said that the front door was open and there was no shade on the door; that a person standing outside in the courtyard could see through the screen door into the house. He said that the child walked over to the parakeets near the fireplace, looked at them and then said, "I'm going to have to go now," and left the house through the same door by which she had entered. He denied that he had sat upon the couch with the child, and that he had put her hand upon his penis. He said that his children were playing in the yard, that the screen was unlocked and that the children went in and out of the place all day long. He stated that at the police station he had told the officers over and over again that he had not molested the child, and that he was telling the truth.

The defendant produced witnesses who testified that his reputation for truth, honesty, integrity and morality was excellent; there was no effort upon the part of the prosecution to rebut such testimony. A witness who resided in the same court, and who knew the child, testified that the reputation of the child for truth, honesty and integrity was bad. The prosecution attempted to rebut the reputation testimony with reference to the child by a former teacher of the child, but on cross-examination the teacher admitted that "All little children tell lies at different times." The child was repeatedly impeached by her own testimony as given at the first trial.

 Milton Kenyon was called as a witness for the defendant. Immediately, the prosecutor sought a conference between both counsel and the judge at the bench. In the proceedings at the bench and out of hearing of the jury, the district attorney stated at first, ". . . counsel is trying to show a lie detector examination of this defendant." The judge at once properly indicated that such would not be admissible, but told counsel for the defendant that he could make an offer of proof, whereupon counsel cited *People* v. *Jones*, 42 Cal.2d 219 [266 P.2d 38], and incorrectly told the court: "In that case the Court found, this was on appeal, that an error had been made by the failure to admit testimony of a lie detector expert who can testify to—perhaps I should have made my offer of proof first, but the lie detector expert could have proved that the accused was not a sexual deviate,

and was incapable of having the necessary intent. To reject such testimony where there is a conflict in the testimony between the victim and the defendant is prejudicial.'' Counsel then continued with an offer of proof, to show ''that Mr. Kenyon is a lie detector technician. He holds—he is accredited to instruct in psychology in California, and he has performed many times lie detector services . . . and he would also testify that he examined this defendant.'' The district attorney then said, ''. . . I have no doubt about the foundation.'' It is not wholly clear to us whether the district attorney was satisfied with the foundation as to Kenyon's being a psychologist, or as to his being a lie detector technician, or as to both. In any event, counsel for the defendant then stated to the judge that Kenyon had ''examined this defendant and he found that this defendant did not have the intent to be *lustive*,'' and that it would be impossible for the defendant to commit the act with which he was charged. The district attorney renewed his objection as to lie detector evidence and the court succinctly restated the matter in saying:

''Well, this is a little bit different from that. He offered the man as an expert psychologist, and as a result of his training he's going to ask this man to state his opinion as to whether the defendant was so psychologically constituted so that he could or could not have done that.''

The district attorney then, without giving the basis for any objection, said, ''I object to it,'' and the court sustained the objection.

Appellant contends (1) that the testimony of the child was improbable, and (2) that it was prejudicial error to refuse to permit Kenyon, as a psychologist, to give his expert opinion as to whether the defendant had the necessary lustful intent to commit the acts complained of.

As to the first contention, it is true that the child's story about the events in question changed from time to time, and she was impeached as to many details, but contradictions and inconsistencies in the testimony of a witness alone will not constitute inherent improbability. (*People* v. *Huston*, 21 Cal.2d 690, 693 [134 P.2d 758]; *People* v. *Trippell*, 7 Cal. 2d 612 [61 P.2d 929]; *People* v. *Stangler*, 18 Cal.2d 688, 691-692 [117 P.2d 321]; *People* v. *Becker*, 140 Cal.App. 162, 165 [35 P.2d 196]; *People* v. *Kearney*, 20 Cal.2d 435 [126 P.2d 612].)

It is the province of the jury to determine the credibility of the witnesses. (*People* v. *Raich*, 26 Cal.App. 286

[146 P. 907].) As said in *People* v. *Asavis,* 27 Cal.App.2d 685, at page 688 [81 P.2d 595] : "As was said in *People* v. *Haydon,* 18 Cal.App. 543 [123 P. 1102, 1114] . . ., 'A statement, to bear upon its face the brand of improbability, or which may be said to be unbelieveable *per se,* must involve, we think, a claim that something has been done that it would not seem possible could be done under the circumstances disclosed, or involve conduct that no one but a person of a seriously calentured mentality would be likely to do.' We are without authority, therefore, to nullify the action of the jury in accepting the story told by the girl and rejecting appellant's version of what took place on the particular occasion referred to."

█ As to the second contention, counsel for the defendant, in his offer of proof and while at the bench, repeatedly referred to Kenyon as a lie detector operator and made reference to the results of a lie detector examination which Kenyon had conducted with the defendant. The district attorney properly objected to any such testimony having to do with the lie detector, because under the rules in this state such evidence is inadmissible. (*People* v. *Aragon,* 154 Cal.App.2d 646 [316 P.2d 370]; *People* v. *Porter,* 136 Cal.App.2d 461 [288 P.2d 561]; *People* v. *Wochnick,* 98 Cal.App.2d 124 [219 P.2d 70]; *People* v. *Carter,* 48 Cal.2d 737, 752 [312 P.2d 665]; *Gideon* v. *Gideon,* 153 Cal.App.2d 541, 545-547 [314 P.2d 1011].) However, as the trial judge pointed out, Kenyon was also a psychologist, and the trial court, in barring his testimony as an expert witness in the field of psychology, faced a different situation.

Counsel for defendant apparently desired to qualify Kenyon as a psychologist, as an expert witness in the field of sexual psychopathy, although he did not clearly so state. If we may assume that counsel did not rely upon the lie detector test results as such, we may also assume that his purpose in introducing the lie detector test matters was to get before the jury the expert opinion of the psychologist, which may or may not have been based in part upon a lie detector test.

Counsel for appellant has placed complete reliance on the case of *People* v. *Jones,* 42 Cal.2d 219 [266 P.2d 38]. In that case the defendant was convicted of two counts in an information charging him with violating the provisions of section 288 of the Penal Code. The principal point of appeal in the case concerned the rejection of certain evidence. At the time of the offense, the child involved, a niece of defendant,

lived with defendant and his wife. The child described certain acts which, if true, amounted to sexual relations without penetration, and would clearly be a violation of the statute. The defendant denied having committed any of the acts related by the child. There was character evidence that the reputation of the defendant for morality was good, and that the child's reputation for truth and veracity was bad. Counsel made an extensive offer of proof that he would produce a physician and surgeon duly licensed under the laws of California specializing in psychiatry, who was a graduate of a recognized school of medicine, and who, for many years, had been specializing in the field of psychiatry and neurology, who was on the staffs of many fine hospitals in Los Angeles County (naming them), and who was an independent medical examiner for the State Department of Mental Hygiene and Los Angeles Psychopathic Court and of the State Industrial Accident Commission; that if produced as a witness, the doctor would testify that he examined the defendant on two occasions, once without the use of drugs and on the second occasion with the aid of sodium pentathol; that as a result of those examinations he had reached the conclusion that the defendant was not a sexual deviate and that he was incapable of having the necessary intent to be lustful, either for himself or to satisfy the lusts of the child of 9½ years.

The court in the Jones case held (at pp. 222-223):

" 'All facts having rational probative value are admissible, unless some specific rule forbids.' (1 Wigmore on Evidence [3d ed. 1940], § 10, p. 293; and *cf.* Code Civ. Proc., § 1868.) The general test of relevancy of indirect evidence is whether it tends logically, naturally, and by reasonable inference to prove or disprove a material issue. (Code Civ. Proc., § 1832; (and cases cited).)"

Further, the court said in the Jones case (at pp. 223-224):

"In the determination of probabilities of guilt, evidence of character is relevant. (Citing cases and authority.) 'The purpose of the evidence as to the character of the accused is to show his disposition, and to base thereon a probable presumption that he would not be likely to commit, and, therefore, did not commit, the crime with which he is charged.' (*State* v. *Lee,* 22 Minn. 407, 409 [21 Am.Rep. 769]. . . .) Proof of the good character of the defendant may be considered as a fact tending to rebut the truth of testimony of an incriminatory character which is sufficient to establish the truth of the charge against him. (Citing cases and authority.)

Character is proved by evidence of the accused's general reputation in the community for the traits which are in issue. (Citing cases.) Such evidence is sufficient to create a reasonable doubt of guilt. (Citing case.)"

The court then went on to declare that by the provisions of the Welfare and Institutions Code (chap. IV, §§ 5500-5522) the Legislature had clearly stated a legislative determination, in effect, that a person who commits sex offenses is more likely to violate section 288 of the Penal Code than one who has no such propensity; that "to some extent there is a cause and effect relationship. Evidence that a person has no such disposition is analogous to that in regard to character, for it bears upon the probability of the innocence of the accused.

"From evidence which tends to prove that a person is not a sexual psychopath, an inference reasonably may be drawn that he did not commit the act denounced by section 288. (See Code Civ. Proc., § 1960.)" (Pp. 224-225.)

The court then, unfortunately for the defendant in the present case, concluded with the statement (at p. 225) : *"The competency of expert opinion in this field of evidence is established by the statutory procedure for the determination of sexual psychopathy* (Welf. & Inst. Code, §§ 5504-5506.)" (Emphasis added.)

Section 5504, Welfare and Institutions Code, sets forth as to the qualifications of the psychiatrists to be appointed, that each one shall be a holder of a valid and unrevoked physicians and surgeons certificate who has directed his professional practice primarily to the diagnosis and treatment of mental and nervous disorders for a period of not less than five years, and one of the three so appointed shall be from the medical staff of a state hospital or a county psychopathic hospital.

It can well be pointed out in the instant case that the report of the psychiatrists at the Atascadero Hospital, after the conviction, confirmed what the defendant was apparently attempting to get before the court in the first instance, namely, that he was not a sexual psychopath, although as heretofore mentioned, he did not clearly so express himself.

In California, we have not adopted the Model Code of Evidence (rules 306, 401-409), nor the Uniform Rules of Evidence (rules 46-57), each of which provides for opinion evidence as to the character of the accused in a criminal action, and as a consequence, this court is bound by the rules of many years standing (see Wigmore on Evidence, 3d ed., §§ 1920-1921). ▆ In the present case it is obvious, if the rule

of the Jones case is applied, that the witness Kenyon, so far as the record demonstrates, falls short of having the necessary qualification or competency to testify as an expert as to the sexual psychopathy of Spigno. There was no showing that as a psychologist Kenyon was competent to measure the propensity of the defendant to commit the act charged. There was no indication of any scientific recognition of the ability of any psychologist to make the determination. If we assume for the moment that the rule of the Jones case, to the effect that only a psychiatrist can testify in such matters, does not apply, it appears that there ought to have been a showing of at least a semblance of scientific acceptance of the psychologist's ability to formulate a dependable conclusion under all of the circumstances of the case. (See *Frye* v. *United States*, 293 F. 1013, 1014 [54 App.D.C. 46].)

We are not unmindful of the sometimes expressed view that the psychologist is as capable as the medical man to express dependable opinions in the particular field here involved. As said in *People* v. *Hawthorne* (1940), 293 Mich. 15 [291 N.W. 205, at page 209]: "There is no magic in particular titles or degrees, and in our age of intense scientific specialization we might deny ourselves the use of the best knowledge available by a rule that would immutably fix the educational qualifications to a particular degree." We are also fully cognizant of the regrettable truth that in many instances innocent people are convicted because of the false accusations made by young girls, and because the rules of evidence permit no adequate probing of the witness' veracity. (3 Wigmore on Evidence, 3d ed., § 924a; see also *Psychiatric Aid in Evaluating the Credibility of a Prosecuting Witness Charging Rape*, 26 Ind. L. Jl. 98.) In fact an American Bar Association Committee on the Improvement of the Law of Evidence (1937-38 Report), once set forth as a prelude to a recommended change, that: "Modern psychiatry has already made its bow and been introduced properly to the criminal courts, by way of examining the mental condition of the accused. But there is also a necessity for invoking its aid for a certain type of witness in a certain class of criminal charges.

"Today it is *unanimously* held . . . by experienced psychiatrists that the complainant woman in a sex offense should *always* be examined by competent experts to ascertain whether she suffers from some mental or moral delusion or tendency, frequently found especially in young girls, causing distortion of the imagination in sex cases.

• • • • • • • • • • • • • •

". . . Thus the erotic imagination of an abnormal child of attractive appearance may send an innocent man to the penitentiary for life. The warnings of the psychiatric profession, supported as they are by thousands of observed cases, should be heeded by our profession." And then the Committee recommended "that in all charges of sex offenses, the complaining witness be required to be examined before trial by competent psychiatrists for the purpose of ascertaining her probable credibility, the report to be presented in evidence." (Wigmore on Evidence, 3d ed., § 924a.)

The Legislature has adopted, since the conviction in this case, a Psychology Certification Act, chapter 2320, 1957 Statutes (Bus. & Prof. Code, §§ 2900-2980), wherein the practice of psychology is now recognized for certain purposes. It is interesting to note that this act provides, in effect, that confidential relations and communications between a registered psychologist and his client are placed upon the same plane as those provided in the law between attorney and client, which is effective in all cases, whereas there is no patient-physician privilege in criminal cases in California. (*City of San Francisco* v. *Superior Court*, 37 Cal.2d 227 [231 P.2d 26, 25 A.L.R.2d 1418]; Code Civ. Proc., § 1881, subd. 4.)

There are many scholars who are convinced that a good psychologist can reveal the intangible framework of a personality as effectively as medical men, by use of blood counts and X-rays, can reveal certain conditions of the physical being of man. (39 Marquette L. Rev. 239-240.) We all recognize that the services of psychologists are playing an increasingly important part in our everyday lives in widely varied fields, such as in advertising, factories, the armed services, prisons, hospitals and schools.

While it is true that a psychologist's opinion cannot be accurate to a provable degree, it perhaps should be remembered "that the court is not the judge of the quality of the evidence, nor does the witness perform the function of a juror—he can only contribute something to the jury's information and if he can, he should be permitted to do so." (*Bratt* v. *Western Air Lines* (1946), 155 F.2d 850, 854.)

There has always existed a considerable lag between advances and discoveries in scientific fields and their acceptance as evidence in a court proceeding. Most middle aged lawyers can remember when evidence of the waves or currents given off by the cerebral tissue would have been inadmissible in any proceeding, and would have been considered fantastic. Today,

no one would seriously contend that an electro-encephalogram would not be proper evidence in certain cases. It was not so very long ago that in some instances courts in California were deciding matters of paternity in illegitimacy proceedings against men whose innocence was scientifically established by the exclusory nature of blood tests. (*Berry* v. *Chaplin*, 74 Cal.App.2d 652 [169 P.2d 442] ; *Arais* v. *Kalensnikoff*, 10 Cal. 2d 428, 432 [74 P.2d 1043, 115 A.L.R. 163] ; McCormick, Evidence, p. 381, note 22, also see p. 382, note 25.) It was appropriately said in *Frye* v. *United States, supra*, 293 F. 1013, at page 1014 · ''Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.''

In this state, courts have determined as to whether psychologists' expert testimony shall be accepted in certain cases. This court, through Presiding Justice White, in *People* v. *Villegas*, 29 Cal.App.2d 658 [85 P.2d 480], affirmed a trial court's rejection of a psychologist's testimony, which would have shown, according to the witness, that the defendant was without sufficient force to ''resist the impulse of this other boy to take him out on these robberies.'' A psychologist was permitted to testify in *People* v. *McNichol*, 100 Cal.App.2d 554 [224 P.2d 21], without objection apparently, in a check forgery case, that one who had consumed a specified amount of whiskey and beer would not have the conscious intent to do what he was charged with doing. However, in the McNichol case the jury convicted the defendant and the judgment was affirmed.

In the case of *Michelson* v. *United States*, 335 U.S. 469, 486 [69 S.Ct. 213, 93 L.Ed. 168], cited in the Jones case, *supra*, it was appropriately said, with reference to the matter of proof of character in criminal cases, ''much of this law is archaic, paradoxical and full of compromises and compensations by which an irrational advantage to one side is offset by a poorly reasoned counterprivilege to the other. But somehow it has proved a workable even if clumsy system when moderated by discretionary controls in the hands of a wise and strong trial court. To pull one misshapen stone out of the

grotesque structure is more likely simply to upset its present balance between adverse interests than to establish a rational edifice.''

It is our opinion, as to appellant's second contention, that the trial court did not, under the law as it now stands, commit prejudicial error. Counsel for appellant failed to offer proof that Kenyon, as a psychologist, was qualified to give an expert opinion as to whether the defendant had the necessary lustful intent to commit the acts complained of. The law in this state still limits the competency of expert opinion in the field of sexual psychopathy to those persons who have medical as well as a psychological training (*People* v. *Jones, supra*); hence while Kenyon's testimony might have proved invaluable to the defendant, it was not legally admissible.

Justice Cardozo's statement in his Law and Literature 108 (1931) is particularly applicable in the instant case: ''The students of the life of the mind in health and disease should combine with students of the law in a scientific and deliberate effort to frame a definition and a system of administration that will combine efficiency with truth.''

Judgment affirmed.

White, P. J., and Drapeau, J.,* concurred.

*Assigned by Chairman of Judicial Council.