[Crim. No. 7590. In Bank. May 26, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD MARCELLUS DAVIS, Defendant and Appellant.

J. Perry Langford, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, C. J.—Defendant killed his victim, Marion Burnett, by pounding her on the head and arms six or more times with a 16½-pound stone. A jury found him guilty of murder of the first degree and sane at the time of the crime, and fixed his penalty at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant's wife of six months, Dorothy, left him and moved to her mother's house four days before the killing. Defendant had asked her several times to return. She always refused, in part apparently because of her belief that he was having sexual relations with her unmarried friend, Marion. Defendant had admitted to her that he had once engaged in

sexual intercourse with Marion. Dorothy and Marion, however, remained close friends.

On the night of the killing, defendant went to his mother-in-law's home to attempt again to persuade Dorothy to return to him. Dorothy and Marion were there together, but were leaving to go to Marion's home. When Dorothy remarked that he arrived just as Marion was leaving, defendant became angry and left. He walked across the street toward his home, ran after he turned a corner, and headed toward Marion's home. When he arrived at the street on which Marion lived, he crossed the street and picked up a large stone. He recrossed the street and hid behind a hedge near the sidewalk. Several minutes later, Marion appeared alone. Defendant advanced toward her, she turned to face him, and he beat her repeatedly with the stone. He then ran, threw the stone into a bush, and returned to his home to join a game of dominoes. An autopsy revealed that Marion was pregnant when she died.

At the trial on the issue of guilt, the prosecution sought to prove that defendant was guilty of murder in the first degree on the grounds that the killing was premeditated and deliberate and was perpetrated by lying in wait. (Pen. Code, § 189.) The prosecution argued as follows: Defendant regarded Marion as the obstacle to his reconciliation with his wife. He may even have been carrying on an affair with Marion that he wished to terminate, particularly because of Marion's pregnancy. He decided early in the evening to kill Marion, or at least to injure her. When the opportunity arose, he ran ahead of her, secured a weapon, and then waited behind the hedge to attack her.

The defendant testified that he had intercourse with Marion only once, while he was drunk, and had no emission. He denied knowing of her pregnancy before he killed her. He presented a witness who testified that Marion accused the witness of being the father of her expected child. Defendant also testified that he thought both women would pass the hedge on their way to Marion's home. His defense was based on three, interrelated theories:

(1) Defendant claimed that the killing was not premeditated. When he hid behind the hedge, he expected both women to pass and he wanted only to scare or talk to them. When Marion passed alone, defendant emerged from his hiding place. She turned to him and he hid his face behind the stone. He stated, ''I didn't want to hit her at first but I didn't know she couldn't have seen me. I kept thinking . . . if I don't

she will tell Dorothy that I tried to or something and she might leave me.'' He then hit Marion on the forehead, she raised her arms in defense and screamed, and he hit her several more times.

(2) Defendant claimed that the killing was committed in a heat of passion. Several days before the killing, he read some notes, passed between Dorothy, Marion, and a third girl in high school the previous year, that convinced him that the girls had been practicing Lesbians. Because Marion and Dorothy were still friendly and were often together, defendant thought their relationship was another reason for Dorothy's leaving him. When Dorothy linked him with Marion on the night of the killing, he became incensed. When he later encountered Marion, he killed her in a heat of passion.

(3) Defendant claimed that he did not have the mental capacity at the time of the killing to premeditate and deliberate. A clinical psychologist, Dr. Robert G. Kaplan, testified that defendant was suffering from a temporary functional psychosis at the time of the killing and was incapable of wilful premeditation and deliberation.

To prove premeditation and deliberation and also to show the circumstances under which the killing was committed, the prosecution introduced a full, corrected, and signed statement made by defendant to the San Diego police. A diagram of the murder scene made by him was also introduced. ▮ Defendant was arrested before noon two days after the killing. He was interrogated continuously by various police officers until, at 8 o'clock that evening he made the statement, recorded by a police stenographer, that was introduced against him. He made the diagram the next morning. Since the record does not show what the officers said to defendant and what he said to them before he made the recorded statement, it does not appear at what point the investigation began to focus on him. It is clear, however, that by the time the recorded statement was commenced, the investigation had focused on defendant and the purpose of the interrogation was to elicit a confession. Although defendant talked to his wife several times before making either the statement or the diagram, there was no showing that he was allowed to see counsel, that he had effectively waived his right to counsel, or that he was informed of his right to remain silent. Under these circumstances the statement and the diagram were inadmissible by virtue of the decision of the United States Supreme Court in *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct.

1758, 12 L.Ed.2d 977]. (*People* v. *Dorado, ante,* p. 338 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Stewart, ante,* pp. 571, 576-581 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Lilliock, ante,* pp. 618, 621 [43 Cal.Rptr. 699, 401 P.2d 4]; see also *Clifton* v. *United States,* 341 F.2d 649; *Galarza Cruz* v. *Delgado,* 233 F.Supp. 944; *State* v. *Dufour,* —— R.I. —— [206 A.2d 82, 85]; *State* v. *Neely,* —— Ore. —— [398 P.2d 482].) ■ Moreover, since this case was tried before the *Escobedo* decision, defendant's failure to object to the admission of the statement and the diagram into evidence does not preclude his raising the question on appeal. (*People* v. *Hillery, ante,* pp. 692, 711 [44 Cal.Rptr. 30, 401 P.2d 382] and cases cited.)

■ It is contended, however, that since defendant took the stand and testified to committing the same acts he confessed to committing in his statement, we should make an exception to the rule that the erroneous admission of a confession into evidence is necessarily prejudicial. (See *People* v. *Dorado, ante,* pp. 338, 356-357 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Stewart, ante,* pp. 571, 581 [43 Cal. Rptr. 201, 400 P.2d 97].) When defendant testified, however, the only substantial evidence that had been introduced connecting him with the crime was his statement and diagram. His testimony was therefore impelled by the erroneous admission of that evidence and cannot be segregated therefrom to sustain the judgment. (*People* v. *Dixon,* 46 Cal.2d 456, 458 [296 P.2d 557]; *People* v. *Ibarra,* 60 Cal.2d 460, 463 [34 Cal. Rptr. 863, 386 P.2d 487]; see also *People* v. *Mickelson,* 59 Cal.2d 448, 449 [30 Cal.Rptr. 18, 380 P.2d 658].)

Moreover, defendant's testimony at the trial was substantially less incriminating than his confession to the officers. Defendant testified that he did not lie in wait to harm his victim or his wife but only intended to scare or talk to them and that he decided to hit Marion with the rock only after she appeared alone and recognized him. If believed, this testimony would have supported a finding of second rather than first degree murder, and to rebut it the prosecution relied on evidence of premeditation contained in defendant's statement. In questioning defendant the officers were careful to probe for such evidence,[1] and in his argument to the jury

---

[1] "Q. To go back to the evening hours of the 4th, you made quite a point of asking your brother-in-law what time it was? A. I didn't ask him what time it was, I asked him was that clock right. Q. What was your reason? A. At the time I was on the verge of thinking of doing it and thinking of going there to play dominoes. Q. What do you mean

the prosecutor stressed its importance to show that the killing was premeditated. He pointed out that "Down at the police station before he talked to a lawyer, before he had time to learn about the differences in penalties between different degrees of murder, manslaughter, he was relatively frank with the police and he said a number of things, which I think should help us figure out—help us to confirm in our opinions the fact that he had planned this, the fact that he had been thinking about it for some time. . . . So he admits to the police before he had acquired sophistication of learning that murder isn't just murder, it is of varying degrees and varying types and varying punishments, back then he admits that he began thinking of getting rid of Dorothy and Marion, way back at 7:00 o'clock. . . ."

Even if we assume that in some cases a testimonial confession can make harmless the erroneous admission of an extrajudicial confession, defendant's testimony in this case did not do so. His testimony was not only impelled by the erroneous admission of the extrajudicial confession, but would have supported a verdict of second degree murder. The erroneously admitted confession rebutted his defense that he was guilty of no more than second degree murder. Whether or not its admission into evidence was necessarily prejudicial, it is reasonably probable that had it been excluded, a result more favorable to defendant would have been reached. Accordingly, the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½; *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 245].)

Other questions remain that may arise on retrial.

■ A motion picture film of the victim at the scene of

---

when you say you were 'thinking of doing it'? A. I mean hitting Marion. I was thinking about the domino game too; they said they would be there around that time. Q. Were you thinking in terms of an alibi? A. Not then, no. Q. Why did you want to hurt Marion? A. Actually, I didn't want to hurt Marion alone. I would hurt Marion or Dorothy or anybody at the time that was with them. . . ." Later, after a rambling, nonresponsive answer to a question, the interview continued: "Q. The original question was—— A. I know. Q. You are building up to why and when you decided to do this. It has been kind of a long explanation and I wondered if we lost the point. We were up to Tuesday night. A. Around 7:00 I had just come from the park, playing basketball. I got to the record shop on Milbrae and Oceanview. Dorothy was standing out there. Again I asked if she was sure she was coming back. She said she didn't know, maybe. She mentioned Marion again. Q. That you and Marion were having an affair? A. Yes, she still thought I was. She wasn't too sure. I told her it was just one time. That's when I thought maybe if I could get rid of Dorothy or Marion, or hurt Dorothy or Marion, I could get it off my mind."

the killing was admitted over defendant's objection. It appears on the face of the record[2] that the court failed to "*weigh* the probative value of the photographs in resolving a material issue as against the danger of prejudice to the defendant through needless arousal of the passions of the jurors." (*People* v. *Ford,* 60 Cal.2d 772, 801 [36 Cal.Rptr. 620, 388 P.2d 892].) If the motion picture is offered in evidence on retrial, the court must determine its admissibility by weighing its probative value against the danger of prejudice.

The notes that convinced defendant of the homosexuality of his wife and the victim were written in three high school notebooks. Defendant contends that the notebooks should have been admitted in their entirety. Defendant testified that he learned of the girls' homosexual relationship by reading the entire notebooks. Upon request of the prosecution, defendant marked the passages that indicated such a relationship to him. The defense was allowed to read these passages to the jury; some 16 passages from various notes were read, and most were reread by defense counsel in his closing argument. The trial court refused, however, to allow the notebooks to be introduced because the great bulk of the material in them was irrelevant and immaterial.

Although the passages read from the notebooks were not used as hearsay, but as circumstantial evidence of defendant's state of mind (see *People* v. *Marsh,* 58 Cal.2d 732, 737-740 [26 Cal.Rptr. 300, 376 P.2d 300]; 6 Wigmore, Evidence (3d ed.) § 1789; 2 *id.,* § 740), these passages were apparently only a small part of the three notebooks. Defendant was allowed to present whatever passages he considered relevant, and he has not shown that their probative value would be enhanced by reading the rest of the notes. There was therefore no abuse of discretion in refusing to admit the entire notebooks.

At the trial on the issue of sanity, defendant sought to establish that he was suffering from a transitory or temporary functional psychosis at the time of the killing and was insane. Two psychiatrists testified for the prosecution that defendant was sane at the time of the killing and that temporary psychoses are never functional in nature. Dr. Robert G. Kaplan, a clinical psychologist who also testified at the trial on the issue of guilt, testified for the defense that because of a temporary functional psychosis at the time of the kill-

---

[2]In ruling on defendant's objection, the court stated: "Well, I viewed [the film] and I feel that while it is not pleasant to look at it is a legal exhibit and it is material for the purposes offered."

ing, defendant could not distinguish between right and wrong and did not know the nature and quality of his act.

▇ Dr. Richard E. Worthington was also called by the defense. Dr. Worthington testified on *voir dire* that he obtained the degree of Doctor of Philosophy from the University of Chicago in 1940 under the Committee on Human Development, specializing in clinical psychology. Although he took the equivalent of about one year of medical school courses in physiology, neurology, and genetics, he did not attend medical school. He testified that he was "the fastest man to go through the University of Chicago"; he passed from freshman to Ph.D. in four and one-half years by taking three times the normal number of courses. He taught psychology at the University of Chicago and Cornell University, and worked as a psychologist at the Menninger Foundation for two years. He has published articles dealing with a wide range of topics within the field of psychology. He was certified by the Psychology Examining Committee of the State Board of Medical Examiners in 1958 (see Bus. & Prof. Code, § 2940 et seq.), and at the time of trial was vice chairman of that committee, which consists of eight members appointed by the Governor. (Bus. & Prof. Code, § 2910.) He was engaged in private practice in San Diego primarily in the treatment of emotional disturbances.

Dr. Worthington was excused by the court because of his lack of medical training. The court ruled that only a medical doctor is qualified to testify as an expert on the issue of sanity.[3]

[3]The court's ruling was somewhat ambiguous. After questioning the witness concerning his medical training, the court simply stated: "The witness is not qualified as an expert on the subject of insanity under the rules, as I understand them, and that is it, period. The witness will be excused." During argument on a motion for new trial, the court attempted to clarify its position. "I didn't find, I invite your attention to this, I did not find that a psychologist, as such, would not be qualified and on the case of the other man [Dr. Kaplan] I simply asked the question, in the presence of the jury—to the District Attorney I may have gone so far as to say I had my doubts about his qualifications, and he said he had no objection to that man testifying, so he testified. Now, I still don't think it is proper and you could argue all day and I wouldn't change my ruling. . . . Here is a man that comes in, glib of tongue, hasn't had a day's medical training at all and he is going to qualify as an expert on sanity, when a part of the mental condition of legal insanity, as we know it in California, is a medical proposition and I would like to see the Supreme Court tell me I am wrong. There is no use to argue that point any further. I am adamant in my opinion on that." Despite the court's statement that it did not hold that a psychologist as such is not qualified, it apparently based its exclusion of Dr. Worthington on the ground that he did not have sufficient medical training.

Defendant contends that this ruling was erroneous.[4]

A witness is qualified to testify about a matter calling for an expert opinion if his peculiar skill, training, or experience enable him to form an opinion that will be useful to the jury. (Code Civ. Proc., § 1870, subd. 9; *Estate of Toomes,* 54 Cal. 509, 514-515 [35 Am.Rep. 82]; *Oakes* v. *Chapman,* 158 Cal.App.2d 78, 83-84 [322 P.2d 241]; McCormick, Evidence, § 13.) Although the determination of the qualification of a proffered witness is ordinarily within the discretion of the trial court *(People* v. *Busch,* 56 Cal.2d 868, 878 [16 Cal.Rptr. 898, 366 P.2d 314]; 2 Wigmore, Evidence (3d ed.) § 561), the standards used in the exercise of this discretion, like other questions of law, are subject to review. Recent cases considering the point have held that a qualified psychologist can testify concerning a defendant's mental condition. *(Jenkins* v. *United States,* 307 F.2d 637, 643-646; *Hidden* v. *Mutual Life Ins. Co.,* 217 F.2d 818, 821; *People* v. *Hawthorne,* 293 Mich. 15, 22-26 [291 N.W. 205]; *State* v. *Padilla,* 66 N.M. 289, 297-299 [347 P.2d 312]; *Watson* v. *State,* 161 Tex. Crim. 5, 8 [273 S.W.2d 879]; cf. *Carter* v. *State* (Okla. Crim. App.) 376 P.2d 351, 359-360. But see *Dobbs* v. *State,* 191 Ark. 236, 239-242 [85 S.W.2d 694]; cf. *State* v. *Gibson,* 15 N.J. 384, 391 [105 A.2d 1]. See generally Lassen, *The Psychologist as an Expert Witness,* 50 A.B.A.J. 239; Louisell, *The Psychologist in Today's Legal World,* 39 Minn.L.Rev. 235; Scheflen, *The Psychologist as a Witness,* 32 Pa.B.A.Q. 329.) Many cases have also noted the use of psychologists in criminal cases without objection or comment. (E.g., *People* v. *Busch, supra,* 56 Cal.2d, at p. 875; *People* v. *McNichol,* 100 Cal.App.2d 554, 558 [224 P.2d 21]; *United States* v. *Chandler,* 72 F.Supp. 230, 237; see also *People* v. *Spigno,* 156 Cal.App.2d 279, 288-291 [319 P.2d 458].)

The defense attempted to prove through two psychologists that defendant was suffering from a temporary

---

[4]The prosecution did not object to the use of Dr. Kaplan because his views had already been presented to the jury at the trial on the issue of guilt. The court, however, made the following comment to the jury on Dr. Kaplan's testimony: ''I will just simply instruct the jury that I don't know whether this witness is qualified either, because he holds no license to practice medicine, any kind of medicine in this state, he is not a psychiatrist and he is not licensed as such. . . . I may say this to the jury, that a lay person, here we are, may testify as to . . . our opinion as to the sanity of an individual if we are acquainted with him and with his habits of life. . . .'' This comment also raised the question whether only a medical doctor is qualified as an expert on legal sanity.

functional psychosis at the time of the crime that made him legally insane. The prosecution's psychiatric experts denied that such a disability could exist. Without the psychologists, therefore, defendant could not establish an insanity defense. The alleged disability did not involve a matter of mental illness completely within the realm of a physician. ■ A functional disorder is by definition nonorganic and without a biological cause. ■ The trial court erred in ruling that only one with medical training could testify on the issue.

■ It does not follow that all psychologists are competent to give an expert opinion on sanity. Many practicing psychologists are not concerned with problems of abnormal psychology and are not familiar with the clinical branch of their field. A certain level of training and experience is also necessary; one with only an undergraduate interest in psychology who has since pursued other fields would certainly not be qualified to give an expert opinion. (Cf. *People* v. *Chambers*, 162 Cal.App.2d 215, 219-220 [328 P.2d 236].) Moreover, not all questions relating to legal sanity can be answered by a psychologist. (See 2 Wigmore, Evidence (3d ed.) § 555, p. 634.) The interpretation of an electroencephalogram or the physiological effect of drugs, for example, may be beyond the ken of a psychologist without medical training. Whether a psychologist qualifies as an expert on sanity in a particular case depends on the facts of that case, the questions propounded to the witness, and his peculiar qualifications.

The judgment is reversed.

Peters, J., Tobriner, J., Peek, J., Dooling, J.,* concurred.

SCHAUER, J.* Dissenting. — In my view the evidence which was properly presented to the jury amply supports the verdicts as to guilt, sanity, and penalty. It must be recognized, however, that under the present status of relevant law as developed in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado* (1965) *ante,* p. 338 [42 Cal.Rptr. 169, 398 P.2d 361] (and made applicable ex post facto in favor of the accused and against the People), the prosecuting attorney, properly under the old law

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

but erroneously under the new, in his argument emphasized the difference between defendant's fact-statements as given before, and those given after, he had conferred with counsel and thereby "had acquired sophistication of learning that murder isn't just murder, it is of varying degrees and varying types and varying punishments, . . ."

The old rule looked with favor on ascertaining the truth; the new rule looks with more favor on giving the illiterate an equal opportunity with the literate to falsify to his own advantage. Thus must police and judicial skills in sorting fact from fiction be developed the more; and thus will the practiced discernment of the trial judge—and of penal boards —probably have better opportunity to correctly recognize basic character and act accordingly. The difference between honesty and cupidity should not be overlooked. Enlightened perjury—or the giving of further opportunity to present it— does not appeal to me as a basis for finding a miscarriage of justice. In the circumstances of this case I am not persuaded that the verdict and judgment work a miscarriage of justice. (See Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 835-836 [299 P.2d 243] [12].)

I must also specifically dissent from the majority's holding that the trial court *erred as a matter of law* in ruling that the witness, Richard E. Worthington, Ph.D. (he had taught psychology and treated emotional disturbances) was not qualified to testify helpfully as an expert witness on any material issue of fact then before the court. A trial judge's discretion in this area should be well-nigh absolute. He is in a position far superior to that of any appellate court to appraise the significance of evidence. An appellate judge can merely read what a transcriber typed from what a phonographic reporter's notes reflect of what the reporter believed he heard. Perhaps an electronic recording device also recorded on disc or tape the sounds of the courtroom. But human reporter or electronic impression get only sounds; the attentive trial judge sees as well as hears. And as every experienced trial judge knows, that which he sees may well be more truth revealing than that which he hears.

From my reading of the record I cannot conclude that the trial judge in his handling of this case was other than fair, competent, careful, patient and sound in all material rulings, including his denial of a motion for a new trial.

For the reasons above stated I would affirm the judgment.

McComb, J., concurred.