Denny **GAFFORD**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. 798.

Supreme Court of Alaska.

April 24, 1968.

Sidney R. Bixler and John E. Havelock, Anchorage, for appellant.

Robert N. Opland, Dist. Atty., and Leroy J. Barker, Asst. Dist. Atty., Anchorage, for appellee.

RABINOWITZ, Justice.

Appellant Denny Gafford was indicted for the first degree slaying of Cecil Joseph Carter.[1] A superior court jury found appellant guilty of murder in the second degree.[2] Pursuant to judgment and commitment which was entered below, appellant was sentenced to serve a term of thirty-five years' imprisonment. Appeal has been taken both from the judgment and commitment and the lower court's denial of appellant's motion for new trial.

In this court appellant urges eighteen separate specifications of error. Before reaching the two substantial issues which appellant has raised, we will discuss the numerous evidentiary rulings of the trial court which have been put in question by this appeal.

Appellant claims that the trial court made improper evidentiary rulings pertaining to testimony of Claudette Carter, the purported wife of the victim, Cecil Carter.[3] This witness related that she

---

1. The indictment alleged the shooting occurred on February 2, 1966.

2. The first trial of appellant on the charge in question resulted in a hung jury.

3. As to four of the claimed erroneous evidentiary rulings (i. e., concerning the Canadian arrests of Mrs. Carter and the wife of appellant, Mrs. Carter's account

and her husband first met the Gaffords in 1963. They thereafter separated, met again in Seattle, and there decided to travel together to Alaska.[4] While en route to Alaska, both Sandra Gafford and Claudette Carter were arrested for vagrancy in Prince Rupert, Canada.[5] The witness further related that the charges against Mrs. Gafford were dismissed but that she, Claudette Carter, received a $300 fine. According to this witness, appellant paid the full amount of her fine and an additional $200 for the bail which he had secured in her behalf. This resulted in a $500 indebtedness owing from Cecil Carter to appellant.

Appellant's position is that it was error for the trial court to have admitted this latter portion of Claudette Carter's testimony over his objections because it placed before the jury the innuendo that he was engaged in the white slave trade with his wife, as well as with the witness.[6] Countering this argument, the state contends this evidence was admissible and relevant because of the light it shed upon appellant's possible motive for killing Cecil Carter. Specifically, the state contends that in the months which followed the Canadian incident the non-payment of this debt became a scabrous issue between Cecil Carter and appellant.[7] We hold that the evidence of Claudette Carter's arrest and appellant's subsequent payment of both the fine and bail bond premium was admissible for the purpose of establishing a possible motive for appellant's slaying of Cecil Carter.[8] We find it unnecessary to decide whether allowance of evidence as to the arrest and discharge of appellant's wife was error, for in our view the reception of this evidence, when measured against the totality of the record in this case, cannot be characterized as other than harmless error.[9]

The next point urged by appellant concerns Claudette Carter's testimony regarding a conversation she overheard between Cecil Carter and appellant three months prior to the former's death. On direct examination the witness related that appellant told Cecil Carter "that he had some pills—narcotics that he wanted Cecil to get rid of" and that in response to this

of overhearing appellant's conversation with her husband concerning the sale of narcotics, and undercover police surveillance of Mrs. Gafford), appellant apparently attempts to argue in his brief that the prosecutor's allusions to these subjects in his opening statement to the jury was error. We note that at no time did appellant's trial counsel object to these portions of the prosecutor's opening statement. The record is also barren of any motion on behalf of appellant to strike these remarks.

4. This witness also testified that appellant said he would pay their, the Carters', way to Alaska.

5. At this point in the proceedings appellant's counsel stated he would stipulate that a debt had been created.

6. Claudette Carter admitted that at the time her husband was killed and for five years prior thereto she had been a prostitute.

7. Claudette Carter also testified to overhearing a conversation between Cecil Carter and appellant which took place within three months of the killing. During this conversation she heard Cecil say, "Man, I could'a paid your money a long time ago, but I didn't feel that I was gonna pay ya' and have to kiss your ass too.'"

8. Watson v. State, 387 P.2d 289, 293 (Alaska 1963). The state argues that Mrs. Carter's testimony that she had been convicted of a crime was admissible to impeach her credibility. We disagree. Civ.R. 43(g) (11) [a], which is applicable to criminal proceedings, provides in part that, "The party producing a witness may not impeach his credit by evidence of bad character." See Civ.R. 43 (g) (11) [b].

9. Crim.R. 47(a) provides: *Harmless Error.* Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. See Daniels v. State, 388 P.2d 813, 816 (Alaska 1964). The state argues that evidence of the arrest of appellant's wife was admissible because, "The jury could readily infer from this that the victim's wife through her misdeeds managed to get the [appellant's] wife arrested when the latter was in fact not guilty of anything." We find the state's theory totally without foundation in the record.

request, Cecil informed appellant "to go * * * himself." Claudette Carter testified that appellant's reaction to Cecil Carter's refusal was one of disgust. In Watson v. State[10] we said:

> Evidence that reveals the commission of an offense other than that for which the defendant is being tried is inadmissible if it is relevant merely to show criminal disposition. But such evidence is admissible, even when it shows the defendant's prior trouble with the law, when it is relevant to prove some other material fact.[11]

■ In Kugzruk v. State[12] it was contended that the court erred in admitting certain testimony "on the grounds that it indicated that appellant attempted to commit a crime other than the crimes for which he was standing trial." In sustaining the trial court's ruling we said "the relevance and probative value of [the witness'] * * * evidence outweighed its prejudicial impact."[13] We reach a similar conclusion in the case at bar. In our view evidence of Cecil Carter's refusal to assist appellant in disposing of narcotics was relevant to the issue of motive, viz., that appellant was angry or disgusted with Carter because of his unequivocal refusal to help in the disposal of narcotics. The relevancy and probative value of this evidence was not outweighed by its potential prejudicial impact upon appellant's case.[14]

■ Appellant also assigns as error the fact that the superior court permitted the prosecuting attorney to elicit responses from appellant on cross-examination to the effect that he did not attend Cecil Carter's funeral.[15] Prior to this line of questioning, appellant had stated that he considered Cecil Carter to be one of his best friends. We therefore hold that the state's questioning of appellant as to his non-attendance at the funeral was proper cross-examination for impeachment purposes.[16] Appellant also asserts as error the admission into evidence of a portion of the rebuttal testimony of an Anchorage Police Department officer. This witness testified that one of his undercover agents had been assigned to watch appellant's wife, Sandra Gafford, in connection with a vice investigation. Scrutiny of the record fails to reveal that counsel for appellant objected to this testimony. Appellant's failure to object waived this point for pur-

---

10. 387 P.2d 289, 293 (Alaska 1963) (footnote omitted).

11. See Smith v. State, 431 P.2d 507, 510 (Alaska 1967) (footnote omitted), where we stated:
   When the main objective to be served by cross-examination is legitimate and permissible as it is here, then the fact that the particular wrongful acts are also suggested or established would be merely incidental and should not prevent the primary and legitimate objective of impeachment by showing bias from being accomplished.

12. Opinion No. 451, at 11, 13, 436 P.2d 962, at 967 (Alaska, February 2, 1968).

13. In *Kugzruk* we cited Harper v. United States, 99 U.S.App.D.C. 324, 239 F.2d 945, 946 (1956), where the court said:
   [T]he rule is that evidence of other offenses is admissible when substantially revelant to the offense charged; inadmissible when its relevance is insignificant; and, in borderline cases, admissible when its relevance outweighs the undue prejudice that may flow from it * * *.

14. There are indications in the record that the trial judge did not weigh or balance the relevancy of this evidence against its prejudicial impact. Nevertheless, we are of the view that the trial court in the exercise of such discretion could have reasonably concluded that the relevancy of the narcotics conversation between appellant and Cecil Carter outweighed any prejudice to appellant.

15. Over objection from appellant's counsel, appellant answered that he did not attend any part of Cecil Carter's funeral.

16. See C. McCormick, Handbook of the Law of Evidence § 47, at 100–01 (1954); Watson v. State, 387 P.2d 289, 293 (Alaska 1963). The question may also be viewed as self-contradiction by means of a prior inconsistent assertion in the form of conduct which tends to cast doubt on the testimony of the witness. Giraney v. Oregon Short Line R. Co., 54 Idaho 535, 33 P.2d 359 (1934); III J. Wigmore, Evidence § 1040(5), at 728 (3d ed. 1940).

poses of review.[17] Additionally, we are of the opinion that receipt of this evidence did not constitute plain error.[18]

During this same officer's rebuttal testimony, the trial court allowed, over defense counsel's objections, the witness to testify that Billy Savage was a "police informant." The case which the prosecution presented against appellant consisted of circumstantial evidence.[19] The state's principal witness was Billy Savage, whose testimony if believed by the jury, presented persuasive evidence of appellant's guilt.[20] Appellant contends that the trial court's ruling pertaining to this testimony permitted improper rebuttal testimony because on the facts of the case, " 'Who killed Cecil Carter?' depended almost entirely on the choice in credibility between [appellant] . . . and Billy Savage." In regard to the conduct of trial proceedings, Criminal Rule 27(a) (3) provides in part that:

The state will then be confined to rebutting evidence unless the court for good

reason, in furtherance of justice, shall permit it to offer evidence in chief.

In Pedersen v. State [21] we stated that:

The trial judge is vested with wide discretion in controlling the order of proof * * *.[22]

On the facts appearing in this record, we hold that it has not been demonstrated that the trial judge abused his discretion in permitting this rebuttal testimony that Billy Savage was a police informant during the period in question.[23] The prosecution witness, Billy Savage, had been subjected to intensive and prolonged cross-examination for the dual purpose of destroying his credibility and also suggesting that he, rather than appellant, was Carter's slayer. This testimony regarding Savage's employment as a police informant tended to rehabilitate his credibility. We hold that the trial judge did not abuse his discretion by holding this evidence admissible in the rebuttal portion of the state's presentation.[24]

17. Kugzruk v. State, Opinion No. 451, 436 P.2d 962 (Alaska, February 2, 1968); Sidney v. State, 408 P.2d 858, 862 (Alaska 1965); Thomas v. State, 391 P.2d 18, 20 (Alaska 1964); McBride v. State, 368 P.2d 925, 928 (Alaska 1962).

18. We further note that appellant has failed to brief this asserted error. See Dickens v. State, 398 P.2d 1008, 1009–10 (Alaska 1965); McIntyre v. State, 379 P.2d 615, 618 (Alaska 1963).

19. No eyewitnesses to the slaying of Cecil Carter were produced by the state.

20. Billy Savage, in part, testified that early in the evening in question he had borrowed a .32 caliber automatic pistol from appellant. Savage further testified that when he returned the pistol approximately an hour and a half later, appellant told him that he wished he had the weapon earlier in the evening when he had talked to Cecil Carter. Later that evening Savage met appellant at a night club and was told by appellant that he wanted to leave—that "He done it." Thereafter appellant and Savage drove to Mountain View to dispose of appellant's gun. During this trip Savage claimed that on five or six occasions appellant stated "he had shot Cecil, and that he needed to get rid of the gun, and not to say anything to anyone."

21. 420 P.2d 327, 337 (Alaska 1966).

22. In Rhodes v. Rhodes, 370 P.2d 902, 906 (Alaska 1962) (footnotes omitted), after both parties had rested, counsel for plaintiff sought to introduce rebuttal evidence on the issues of incompatibility of temperament and child custody. The trial court denied the request because it was of the opinion that there was sufficient testimony before it upon which to base a decision. In our opinion we said in part:
The trial court was 'vested with a sound discretion as to the permissible scope of evidence offered in rebuttal.' We find no abuse of that discretion in this instance.

23. See the following cases where the courts have held that although a particular item of evidence should actually have been offered in chief, the trial judge in his discretion was permitted to allow it as rebuttal: Casey v. Seas Shipping Co., 178 F.2d 360 (2d Cir. 1949); National Sur. Corp. v. Heinbokel, 154 F.2d 266 (3d Cir. 1946); United States v. Savannah Shipyards, Inc., 139 F.2d 953 (5th Cir. 1944).

24. The trial judge, in ruling upon appellant's objection to this rebuttal testimony, stated to appellant's counsel, "If there is any inference to be drawn that is in favor of your client, rather than

Appellant was afforded the opportunity to present surrebuttal evidence. The record shows appellant called only one witness in rebuttal and that this witness gave testimony concerning appellant's wife's bringing a sympathy card to Claudette Carter's residence two days after Cecil Carter's death. Appellant was not limited in any manner from delving into the subject of Billy Savage's purported status as a police informant.

In regard to the cross-examination of Billy Savage, appellant additionally contends that the trial court erred in failing to grant a mistrial when the witness "volunteered" that he had taken a lie detector test. Appellant further contends that when the trial court determined to overrule his motion for mistrial "it should have given an instruction on its own motion, or on the indication of the prosecution, if it were to avoid the case law indicating a mistrial was necessary under the circumstances." The trial transcript shows that the following took place during counsel for appellant's cross-examination of Billy Savage:

Q  Mr. Savage, you've * * * you must have told the * * * accounts of the story of the events of February the 2nd, any, many times, haven't you.

A  According to what you call many, many times—here in this courtroom, and * * * what was said to the police, that is the only thing.

Q  Police and the courtroom?

A  Yes.

Q  Well, you must have gone over it quite a few times with the police, didn't you?

A  No.

Q  You didn't?

A  Wouldn't say, many times.

Q  They only—you only gave the account of the event once, did you?

A  No, sir. I'd say two or three times.

Q  Two or three times.

A  I was telling a lie detector about it.

■ At this point defense counsel moved for a mistrial or, in the alternative, an instruction. The court denied the motion for mistrial. After a recess, counsel for appellant informed the court they had decided not to request an instruction because they did not want "to underline" the lie detector answer. In view of the decision made at trial by his counsel, we hold that appellant is now precluded from asserting that it was error for the trial court not to have instructed the jury to disregard Billy Savage's reference to a lie detector.[25]

■ Appellant further argues that the jury must have concluded that Savage passed the lie detector test and therefore his account of the events of the early morning hours of February 2, 1966, was correct. The general rule is that the results of polygraph tests are not admissible in evidence.[26] In support of its position that the lower court did not err in denying appellant's motion for mistrial, appellee relies on Johnson v. State.[27] There the court said that where

otherwise." This is not too unrealistic an appraisal of the situation because Billy Savage had testified that he "never had any assistance out of the Police Department, but a lot of trouble." At another point in his testimony, Savage testified that he thought appellant, appellant's wife, and Cecil Carter were police officers.

25. *See* Rank v. State, 373 P.2d 734, 736 (Alaska 1962), where this court said:
    During the trial Rank had presumably taken the position that to explore the subject in detail would be advantageous to his cause. In this court he adopts

the totally inconsistent position that he has suffered a grave disadvantage. We hold he is bound by the choice he first made in the court below.

26. United States ex rel. Sadowy v. Fay, 189 F.Supp. 150 (S.D.N.Y.1960), aff'd, 2 Cir., 284 F.2d 426, cert. denied, 365 U.S. 850, 81 S.Ct. 814, 5 L.Ed.2d 814 (1961); United States v. Tremont, 351 F.2d 144 (6th Cir. 1965), cert. denied, 383 U.S. 944, 86 S.Ct. 1198, 16 L.Ed.2d 207 (1966); United States v. Stromberg, 179 F.Supp. 278 (S.D.N.Y.1959).

27. 166 So.2d 798, 805 (Fla.App.1964) (emphasis the court's).

a prosecution witness was revealed to have been a polygraph examiner there was no prejudicial inference raised against the defendant because

the mere fact that the jury is apprised that a lie detector test was taken is not necessarily prejudicial if no inference as to the result is raised or *if* any inferences that might be raised as to the result are not prejudicial.

Also of significance is the case of People v. Martin [28] where the court said:

We note that in the present case the only inference to the *results* of Baum's test was the statement made in argument. That statement was properly stricken. The only remaining statements are those of Baum. They are not statements about the results of the test, but only about the fact that he took the test. Because these latter statements do not raise any issue as to the reliability of the lie detector test, their exclusion is not justified by the rationale given in Zazzetta for excluding evidence concerning the results of a lie test. Hence, we conclude that the trial court did not err in allowing Baum's statements that he took a lie dectector test to go into evidence. [29]

In light of the *Johnson* and *Martin* decisions and the fact that Savage's reference to a lie detector was elicited during counsel for appellant's lengthy and vigorous cross-examination of the witness, we hold that the trial court did not err in denying appellant's motion for mistrial. [30]

Appellant's next point is that the trial court committed error in permitting the state, as part of its case in chief, to introduce portions of the testimony he gave at the first trial which resulted in a deadlocked jury. It is well established that the testimony of an accused at a former trial is admissible against him at the second trial over self-incrimination objections. [31] In Edmonds v. United States [32] the court said:

It is generally held, unless a statute directs otherwise, that a defendant in a criminal case who takes the stand in his own behalf and testifies without asserting his privilege against self-incrimination thereby waives the privilege as to the testimony given so that it may be used against him in a subsequent trial of the same case. The fact that the defendant does not take the stand at the second trial does not prevent the use of his testimony given at the former trial, if it would otherwise be admissible.

We adopt this view and hold that appellant's former testimony was not barred by any claim grounded upon the privilege against self-incrimination. [33] Appellant further argues that his former testimony was

28. 62 Ill.App.2d 203, 210 N.E.2d 798, 802 (1965), aff'd, 35 Ill.2d 289, 220 N.E.2d 170 (1966) (emphasis added).

29. The court in People v. Martin immediately preceding the text we have quoted, stated:
As the Supreme Court stated in People v. Zazzetta at page [302] 306, of 27 Ill.2d, at page [260] 263 of 189 N.E. 2d, 'the reason most commonly assigned for the exclusion of the results of a lie-detector from evidence is the contention that the lie-detector has not yet attained sufficient scientific acceptance as a reliable and accurate means of ascertaining truth * * *.'

30. Out of the hearing of the jury the trial court permitted appellant's counsel to question Billy Savage as to the possibility that the district attorney had

primed him to refer to a lie detector test. We note that there is no indication in the record to support the suggestion that the witness was coached in advance.
See also Straight v. United States, 263 F.2d 811 (9th Cir. 1959).

31. See VIII J. Wigmore, Evidence § 2276, at 472–73 (McNaughton rev. 1961); C. McCormick, Evidence § 132, at 276 (1954).

32. 106 U.S.App.D.C. 373, 273 F.2d 108, 112–113 (1959), cert. denied, 362 U.S. 977, 80 S.Ct. 1062, 4 L.Ed.2d 1012 (1960). See also United States v. Grunewald, 164 F.Supp. 644 (S.D.N.Y.1958).

33. In reaching this conclusion we reject appellant's contention that the hearsay rule rendered this former testimony inadmissible.

rendered inadmissible under Miranda v. Arizona [34] which case was decided after his first trial had taken place. Appellant's position is that when he was first arrested he made several statements to the arresting officer which were obtained in violation of the *Miranda* rule. Because of these statements (then admissible) he was "impelled" to testify in his own behalf at his first trial. From this, appellant reasons that all of the testimony he gave at the first trial was "fruit off the poisoned tree" and, therefore, should have been excluded at the second post-*Miranda* trial. Appellant's theoretical position finds support in People v. Polk [35] and People v. Davis.[36] In the first of these cases defendants were questioned in violation of Escobedo v. State of Illinois.[37] The interrogation resulted in confessions which were used in the first trial against them. Since they were faced with the death penalty and had no other evidence to present, defendants took the stand in their own behalf. At the second trial the state attempted to use their first trial testimony. (Their confessions were excluded in the second trial.) The California court held that their former testimony could not be read into evidence at the second trial because it was "impelled by the erroneous admission of the confession and cannot be segregated therefrom to sustain the judgment."[38]

We believe that the *Polk* and *Davis* decisions are distinguishable on several grounds. Unlike the factual circumstances appearing in those cases, in the case at bar the testimony of appellant at the first trial was not impelled by the exculpatory statements which he had made to the arresting officer assertedly in violation of the *Escobedo-Miranda* rule. Here the rule clearly demonstrates that appellant testified at the first trial before the arresting officer gave testimony in rebuttal. Thus, in the present case appellant's former testimony cannot be characterized as the poisoned fruit of illegally obtained statements made by him to the arresting officer.[39] We find no error in the trial court's ruling which permitted the admission into evidence of appellant's former testimony.

Concerning his testimony at the second trial, appellant contends that the trial court erroneously allowed the prosecuting attorney to propound questions which dealt with the details of appellant's prior criminal convictions. The record of the second trial shows that during appellant's direct testimony he revealed that he had a "police record." At this point the following colloquy took place between appellant and his counsel:

Q What is your police record?

A I've been convicted for three felonies.

Q How old were you when you were convicted of each of those three felonies?

A I was 15 years old the first time I was convicted and sent to prison * * *.

Q When was * * * what state was that?

34. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 634 (1966).

35. 63 Cal.2d 443, 47 Cal.Rptr. 1, 406 P.2d 641, 644 (1965).

36. 62 Cal.2d 791, 44 Cal.Rptr. 454, 402 P.2d 142 (1965).

37. 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977 (1964).

38. In People v. Davis, 62 Cal.2d 791, 44 Cal.Rptr. 454, 402 P.2d 142, 145 (1965), the court said:
When defendant testified, however, the only substantial evidence that had been introduced connecting him with the crime was his statement and diagram [given to the police in violation of *Escobedo*]. His testimony was therefore impelled by the erroneous admission of that evidence and cannot be segregated therefrom to sustain the judgment.

39. For purposes of our holding we have assumed, without deciding the question, that the statements in question were received by the arresting officer in violation of *Escobedo* and *Miranda*.

A  In Oklahoma.

Q  The second time?

A  I was 17 years old. I was sent back to prison. And, I was 19 years old, when I was sent back again.

Q  How old are you now, Mr. Gafford?

A  Twenty-five.

Under the provisions of Civil Rule 43(g) (11)[b] which have been specifically made applicable to criminal proceedings, it is provided that a witness may be impeached by the party against whom he was called by contradictory evidence, et cetera, but, "He may not be impeached by evidence of particular wrongful acts, except that it may be shown by the examination of the witness or the record of a judgment that he has been convicted of a crime." [40] Technically our rules of procedure do not authorize a defendant to initially adduce evidence of his own prior criminal convictions. We recognize that because defendants are subject to impeachment through proof of prior convictions, as a matter of strategy, defense counsel often

have the defendant himself reveal his prior convictions in order to lessen the prejudicial impact such evidence may carry with it when used by the prosecution for impeachment purposes.[41] This is the first occasion we have had to pass upon the question of how far the prosecution may inquire concerning the details of a defendant's previous criminal convictions.

■ We hold that the prosecution's inquiry should be limited to the name of the crime, time and place of conviction, and the sentence imposed. It is our belief that this rule will minimize the "prejudice and distraction" from the issues which may flow from our general impeachment rule.[42] Turning to the facts of this case, the record shows that after appellant on direct examination had disclosed his criminal record, the prosecutor cross-examined him about this subject. After ascertaining that appellant's second conviction was for the crime of assault with a dangerous weapon, the prosecution established that appellant was married at the time.[43] The

---

40. Prior to the adoption of this rule of procedure, this court held in Anderson v. State, 384 P.2d 669, 673 (Alaska 1963), that a witness may be asked whether he had been convicted of a crime.

41. Compare Sidney v. State, 408 P.2d 858 (Alaska 1965).

42. See C. McCormick, Evidence § 43, at 92–93 (1954) (footnotes omitted), where the author states:

On the whole, however, the more reasonable practice minimizing prejudice and distraction from the issues, is the one generally prevailing that beyond the name of the crime, the time and place of conviction, and the punishment, further details such as the name of the victim and the aggravating circumstances may not be inquired into.

See also Hockaday v. Red Line Inc., 85 U.S.App.D.C. 1, 174 F.2d 154, 9 A.L.R. 2d 601 (1949).

In regard to another facet of the problem, Professor McCormick states at 93:

It may be thought that if the impeacher is precluded from showing details and circumstances of aggravation, the witness should similarly be cut off from explaining or extenuating the conviction or denying his guilt. Certainly it is impractical and forbid-

den to re-try the case on which the conviction was based. And many courts forbid any explanation, extenuation or denial of guilt even by the witness himself on re-direct. This is a logical consequence of the premise of conclusiveness of the judgment. It does not, however, satisfy our feeling that some reasonable outlet for the instinct of self-defense by one attacked should be conceded, if it can be done without too much damage to the business at hand. Accordingly a substantial number of courts, while not opening the door to a re-trial of the conviction, do permit the witness himself to make a brief and general statement in explanation, mitigation, or denial of guilt, or recognize a discretion in the trial judge to permit it. Wigmore aptly terms it a 'harmless charity to allow the witness to make such protestations on his own behalf as he may feel able to make with a due regard to the penalties of perjury.' (footnotes omitted)

43. The record reads:
Q  The second time, you said you were 17 years old, is that correct?
A  Yes.
Q  Were you married at that time?
A  Yes, I was.

prosecuting attorney then asked, "And, upon whom did you commit that assault?" Defense counsel objected to this question and was sustained. The transcript then shows the following:

Q What type of weapon did you use on the second conviction?

A It was a knife. (pause)

Q You said, that you were a very good friend—or a good friend of Cecil Carter * * *.

At this point counsel for appellant objected and the court overruled his objection on the ground that counsel permitted the witness to answer without objection. Nevertheless, the court instructed the jury at that time that "the only reason for allowing any evidence of previous convictions is, to what effect if any, it may have on your judgment as to the credibility of the witness—I'm not allowing the evidence to prove that the man's a generally bad man or anything of that kind." In his formal charge to the jury at the conclusion of the case, the trial judge instructed the jury that such evidence could be considered by them only for the purpose of judging the credibility of the witness. In light of this record, we cannot find that the trial court erred in overruling appellant's objection.

During the course of his final argument to the jury, the prosecuting attorney suggested that appellant was motivated to kill Cecil Carter because he suspected that Carter was responsible for the police surveillance and pressure which had been directed towards appellant.[44] In Anderson v. State [45] we said:

Counsel should in argument confine themselves to matters within the record, or fairly deducible therefrom.

Here appellant argues that the record is "devoid of any competent evidence that any 'heat' was applied to [appellant] or that he would have any knowledge that he was under surveillance, as a result of information from an informer or otherwise." We hold that the prosecutor's closing remarks were within the range of reasonable inferences which could be drawn from the evidence and therefore permissible.[46] We further note that counsel for appellant made no objection to these comments of the prosecutor at the trial.[47]

Appellant's next two assertions of error are concerned with events which transpired between the time when the jury was given the case for deliberation and the filing of their verdict of guilty of murder in the second degree. The case was submitted to the jury at approximately 4:00 p. m. on October 3. At 6:13 p. m. the following day in the presence of appellant and counsel, the foreman of the jury informed the

44. The record reflects that the prosecuting attorney stated the following:
And then suddenly your third motive. Police pressure on Denny Gafford and Sandra Gafford. Police pressure to the extent that an undercover man is assigned to them. Ladies and gentlemen of the jury you cannot put that kind of pressure on a man without him knowing it, without him sensing it, without him feeling it. And how he must have looked, and how he must of wondered, why me? But he already had a * * * logical suspect * * *. He blamed Cecil Carter. * * * Now Ladies and gentlemen, with that segment of society for a turn around like that there's only one retribution, only one payment and that's death.

45. 384 P.2d 669, 674 (Alaska 1963). *See also* Bentley v. State, 393 P.2d 225, 230 (Alaska 1964) (necessity of an evidentiary basis for prosecuting attorney's remarks); Marrone v. State, 359 P.2d 969, 980–983 (Alaska 1961). *Compare* Anderson v. State, Opinion No. 461, at 7–11, 438 P.2d 228 (Alaska, March 8, 1968); McCracken v. State, 431 P.2d 513 (Alaska 1967).

46. There was evidence adduced that both appellant and his wife were under police surveillance. Billy Savage also testified that he had told appellant that Cecil Carter was trying to set him up in a narcotics deal.

47. In his closing argument to the jury, appellant's counsel commented that the prosecutor's remarks in question were wholly unsupported by the evidence.

court that they had reached a verdict.[48] The verdict was "not guilty" of first degree murder but "guilty" of murder in the second degree. During the reading of the verdict, the transcript reflects that "Mr. Gafford has an emotional outburst."

Appellant's counsel then requested that a poll of the jury be undertaken. After four jurors had been polled, the clerk asked juror Mary Ann Field whether the verdict just read was her verdict. At this point in the trial the record reads as follows:

> JUROR FIELD: (Pause of 30 seconds) (no reply) (Whereupon Mrs. Gafford, during the pause of 30 seconds has an emotional outburst 'No, oh, please, no.')
>
> THE COURT: Jerry Williams, I think you better take care of your client. We can't have that going on.
>
> (Mrs. Gafford, still sobbing)
>
> THE CLERK: Shall I repeat the question, Your Honor?
>
> (Mrs. Gafford, still sobbing)
>
> THE CLERK: Mary Ann Field, is the verdict just read, your verdict?
>
> (Inaudible whispering by Mr. Williams, calming Mrs. Gafford)
>
> JUROR FIELD: (Pause of 28 seconds) (no reply)
>
> THE COURT: Pass Mrs. Field, temporarily.

The remainder of the jurors were then polled and the following transpired:

> THE CLERK: Shall I re-ask the question of Mrs. Field, again?
>
> THE COURT: Yes.
>
> THE CLERK: Mary Ann Field, is the verdict just read, your verdict?

> JUROR FIELD: Yes, under my (pause)—against my better judgment.

The trial court then stated to the jury that a verdict against juror Field's better judgment was not a unanimous verdict and further informed them that they "may retire to continue [their] * * * deliberations." Shortly thereafter, at 6:30 p. m., the court again convened and in the presence of counsel and appellant, the court read into the record a note it had received from the foreman of the jury. The note read:

> We are going to deliberate further on the verdict. I am sure that it was emotions that caused this. If you have any further instructions we will follow them. (Signed Bud Metzgar.)

The transcript then shows that the trial judge stated:

> Ladies and gentlemen, I would like to apologize for the emotion that was shown here in the courtroom. Now, maybe it's understandable, I suppose it is; but it's inexcusable. And, I have asked Mr. Williams to arrange for Mrs. Gafford not to be here during any further proceedings, and he has done so. Mr. Williams has apologized to the Court, and I want the jury to understand he wasn't responsible.

At this point the trial judge gave the jurors an additional instruction which was essentially an "Allen Charge," used in cases where the jury is deadlocked. After being given hotel accommodations, the jurors returned a unanimous verdict the next morning. Although not objected to at the trial, appellant now claims that under all the circumstances the giving of the "Allen Charge" deprived him of his right to a fair trial.

---

48. At 8:45 a.m. on the 4th of October, the trial judge inquired whether the jury might be able to reach a verdict through continued deliberations specifically disclaiming any interest in how the panel stood. The jury was then instructed to retire once more and continue its deliberations. At 11:45 a.m. the same day, the court went on record to state that the jury wished to continue its deliberations. At 4:33 p.m. the court was reconvened and the jury foreman stated that he thought a verdict might be reached within an hour.

In Chase v. State[49] the propriety of this type of charge was upheld. In that case the jury, after a considerable period of deliberation, returned and informed the judge that they had split eleven to one and could not come to any agreement upon a verdict. In *Chase* we said:

> Following this communication to the court the judge gave the controversial additional instruction. In substance the court told the jury that although each juror's verdict should be the result of his own convictions and not a mere acquiescence in the conclusions of the other jurors, yet each juror should examine the questions submitted with candor and with a proper regard and deference to the opinions of each other. The judge told the jury that where a large number of the panel were for conviction or acquittal, a dissenting juror should consider whether a doubt in his mind is a reasonable one which makes no impression upon the minds of so many men equally honest, equally intelligent with himself, who have heard the same evidence with the same attention. However, the court emphasized the fact that no juror should surrender his conscientious convictions, and that a verdict arrived at and to which a juror agrees must be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusions of the other jurors. * * *

> The supplemental instruction as given verbatim was previously considered by the Ninth Circuit and held to be a correct statement of the law. We agree, and therefore find no error.[50]

The instruction in the case at bar conforms to the instruction which was approved by this court in the *Chase* case. Both in the *Chase* case and this case the judge was informed of the split not as the result of his own inquiry. In the leading case of Bowen v. United States[51] it was held that when the jury foreman informs the judge, without being asked, of an eleven to one split in the panel, and the court then delivers the supplemental Allen Charge, it is not error.[52] On the basis of the *Chase* and *Bowen* decisions, we hold that the trial court did not err in giving the supplemental instruction to the jury after the one juror had disclosed that the verdict was against her judgment.[53]

---

49. 369 P.2d 997, 1004–1005 (Alaska 1962) (footnote omitted).

50. *See also* Hutson v. United States, 238 F.2d 167, 173, 16 Alaska 485 (9th Cir. 1956), which approved the use of the Allen Charge.

51. 153 F.2d 747 (8th Cir.), cert. denied, 328 U.S. 835, 66 S.Ct. 980, 90 L.Ed. 1611 (1946).

52. In *Bowen* the court points out that Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926), and the cases which follow it, held that reversible error occurred only in the cases in which the judge inquired of the jury as to its numerical division.

53. The supplemental charge was, in our view, a balanced one. *See* Powell v. United States, 297 F.2d 318 (5th Cir. 1961); United States v. Rogers, 289 F. 2d 433, 437 (4th Cir. 1961). We also note that the jury did not hastily reach its verdict after the supplemental charge was given.

We are cognizant that the Allen Charge has been criticized by other courts and individual judges. *See* Andrews v. United States, 309 F.2d 127, 129–130 (5th Cir. 1962) (Wisdom J., dissenting), cert. denied, 372 U.S. 946, 83 S.Ct. 930, 9 L.Ed. 2d 970 (1963); Huffman v. United States, 297 F.2d 754, 759 (5th Cir.) (Brown J., concurring, dissenting), cert. denied, 370 U.S. 955, 82 S.Ct. 1605, 8 L.Ed.2d 820 (1962); State v. Thomas, 86 Ariz. 161, 342 P.2d 197, 200 (1959); State v. Randall, 137 Mont. 534, 353 P.2d 1054, 1058, 100 A.L.R.2d 171 (1960).

In Green v. United States, 309 F.2d 852, 854 (5th Cir. 1962), the court said:
The Allen or 'dynamite' charge is designed to blast loose a deadlocked jury. There is small, if any, justification for its use. Nevertheless, an old decision of the Supreme Court has upheld the charge as a reminder to jurors that 'they should listen, with a disposition to be convinced, to each other's argument.' Allen v. U. S., 1896, 164 U.S.

After the jury received the supplemental Allen Charge, court was reconvened at 9:30 a. m. the next morning. At this point the record shows that the trial judge stated that at

approximately 8:45 this morning I received the following note from the Foreman of the jury.

'October 5th, 1966. Honorable Judge Davis: In view of the emotional outburst of last evening the jurors unanimously ask that the court be cleared at the time of returning the verdict. Bud Metzgar, Jury Foreman.'

I answered that note as follows:

I cannot clear the courtroom. Court must be opened at all times. The defendant is entitled to be present, in any case, in fact, he must be present. I will arrange, in fact to have have arranged for a State Policeman—to have a State Policeman present for further proceedings. If a verdict is reached it will take about 15 minutes to get everybody together.

Appellant's position regarding the foregoing is that the exchange of notes between the judge and jury without his, or counsel's, knowledge constituted reversible error. Appellant argues that the natural inference to be gleaned from the jury's request to have the courtroom cleared was that it should be cleared of spectators. However, appellant argues that from the text of the court's note the court suggested that a verdict of guilty probably would be returned and that appellant was a dangerous man.

In Noffke v. State [54] we held that Criminal Rule 38 which requires that the defendant "be present * * * at every stage of the trial * * *" is violated whenever the judge communicates with the jury about any aspect of the case outside of the presence of the defendant or his counsel. There we also said that:

Nonadherence by the trial court to the provisions of Crim. R. 38 does not automatically constitute reversible error. A violation of the mandate of Crim. R. 38 is not prejudicial error unless such nonadherence has affected a substantial right of the defendant.[55]

██ Here we hold that the trial court's action in answering the foreman's note did not affect a substantial right of the appellant and therefore did not constitute reversible error. The inferences of prejudice that appellant would have us draw from the text of the note involve a high degree of unwarranted speculation. Appellant would have us overlook the fact that the record shows he did have "an emotional outburst," at the first reading of the jury's verdict, that his wife had several emotional outbursts during the first polling of the jury, and that the note in question, unlike the communication involved in *Noffke* had no direct bearing on the merits of the litigation.

Thus, after review of the entire record in this case we are of the opinion that none of the claimed errors in this appeal, either standing alone or when considered cumulatively, resulted in the denial of a fair trial to appellant. We, therefore, affirm the judgment and commitment which was entered below. This leaves one additional point to be resolved in this case.

---

492, 17 S.Ct. 154, 41 L.Ed. 528. This is the outermost limit of its permissible use. There is no justification whatever for its coercive use. The jury system rests in good part on the assumption that the jurors should deliberate patiently and long, if necessary, and arrive at a verdict—if, but only if, they can do so conscientiously. It is improper for the court to interfere with the jury by pressuring a minority of the jurors to sacrifice their conscienti-

ous scruples for the sake of reaching agreement.

54. 422 P.2d 102, 105 (Alaska 1967) (footnotes omitted).

55. *See* Egelak v. State, Opinion No. 463, 438 P.2d 712 (Alaska, March 21, 1968) and Kugzruk v. State, Opinion No. 451, 436 P.2d 962 (Alaska, February 2, 1968), for recent decisions of this court dealing with violations of Crim.R. 38.

After the completion of the trial and the filing of the jury's verdict, juror Mary Ann Field authored an affidavit alleging various irregularities had been committed by the jury in reaching its verdict. The juror begins her affidavit with the statement that the verdict

> was not her true and considered verdict but was the result of exhaustion and intimidation through the remarks of other jurors and through sympathy for the physical welfare of the other jurors.

As to the purported acts of misconduct on the part of her fellow jurors, Mrs. Field averred:

> That one or more of the jurors went outside the evidence introduced in the case and stated that the time the late show ended in the early hours of February 2nd had been checked, a time factor considered critical by the jury in its deliberations.
>
> That one of the jurors went to the gas station in Mountain View mentioned in the evidence to ascertain whether the station had been open at the time stated in the testimony of one of the State's witnesses.

In West v. State [56] a juror attempted to impeach his verdict on the ground of fatigue and pressure from other jurors. In rejecting this contention we cited several cases where the jury had been out longer than was the jury in the case at bar. In *West* we also stated that:

> It is the overwhelming weight of authority that a juror generally cannot impeach the jury's verdict by his testimony or affidavit. * * *
>
> Exceptions to the general rule have been made and it has been held that the type of misconduct which may impeach a verdict is fraud, bribery, forcible coercion or any other obstruction of justice. Whether the verdict should be set aside and a new trial ordered rests

in the sound discretion of the trial judge, but generally the verdict should stand unless the evidence clearly establishes a serious violation of the juror's duty and deprives a party of a fair trial.

In Watson v. State [57] the verdict in a previous trial of the defendant on the same charge had been set aside and a new trial ordered because of the admission in evidence of a hearsay statement reputedly made by defendant's wife when she was told by the police that her husband had shot the deceased. After completion of the second trial, members of the jury made affidavits to the effect that a newspaper account of the trial, in which was reported verbatim the precise hearsay statement which we held inadmissible at the first trial, was brought into the juryroom and made known to the members of the jury. In *Watson* we held:

> [A]ppellant's showing in support of his motion for a new trial demonstrates that a case has been made out for an exception to the general rule which prohibits jurors from impeaching their verdicts. We are of the further opinion that in view of the record in this case appellant's showing clearly establishes that he was deprived of a fair trial by virtue of the * *. * article which appeared in the Anchorage Daily Times.
>
> * * * * * *
>
> * * * Here the very statement, which by virtue of the law of the case had previously been determined to be inadmissible and prejudicial, was actually before the jury without the knowledge of either the trial court or * * * counsel.[58]

We believe that our precedents are dispositive of juror Field's exhaustion-mental intimidation ground for the granting of a new trial. As previously indicated, in West v. State [59] we held that the showing made there did not warrant

56. 409 P.2d 847, 852 (Alaska 1966) (footnotes omitted).

57. 413 P.2d 22 (Alaska 1966).

58. Id. at 24–25. *Compare* Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed. 2d 420, 422 (1966).

59. 409 P.2d 847, 852 (Alaska 1966).

permitting impeachment of the verdict. After scrutinizing the record in view of juror Field's assertions concerning her mental and physical state, we have concluded that the showing made was insufficient and the new trial court did not abuse its discretion in refusing to grant a new trial on this ground.

As to the portions of the Field affidavit which concerned checking the time of the late show television program concluded on the morning of the slaying, and the juror's investigation into the business hours of a certain service station located in Mountain View, a majority of this court holds that appellant's showing failed to clearly establish a serious violation of the jurors' duties and concomitant deprivation of a fair trial.[60] In such circumstances the majority holds that the trial court did not abuse its discretion in refusing to set aside the judgment and commitment or in refusing to order a new trial.

In ruling upon appellant's motion for new trial which was grounded in part upon juror Field's affidavit, the trial judge stated:

> There's no suggestion here—that if they did that they learned anything and that if they learned anything that they passed on the information to the other jurors. Take the statement just the way it reads, it would appear that if it happened that the juror acted improperly, but there isn't any indication from anybody and from any source that whatever they did was passed on to the other jurors.

In affirming the trial judge's ruling on the issue, the majority considers it significant that the juror's affidavit does not allege that the unnamed jurors misinformed the jury on the matters mentioned, nor that any juror, including the affiant, was improperly influenced, nor that appellant's case was prejudiced as a result.[61]

The judgment and commitment and the superior court's denial of appellant's motion for new trial are affirmed.

---

**60.** West v. State, 409 P.2d 847, 852 (Alaska 1966). In this opinion we cited McDonald v. Pless, 238 U.S. 264, 267, 35 S.Ct. 783, 59 L.Ed. 1300, 1302 (1915), where the rationale supporting the prohibition against a juror's impeaching his own verdict was stated as follows:

> But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.

**61.** In my opinion juror Field's allegations as to improper conduct on the part of her fellow jurors were sufficient to put in question the fairness of the trial which appellant received and to require that a hearing be held. I believe that justice requires the remanding of this case to the superior court for the sole purpose of conducting a further hearing in regard to these assertions of improper conduct. State v. Kociolek, 20 N.J. 92, 118 A.2d 812, 816, 58 A.L.R.2d 545 (1955). Note, 54 Mich.L.Rev. 1003, 1004–05 (1956); Note, 56 Col.L.Rev. 952, 953 (1956). See Remmer v. United States, 347 U.S. 227, 229–330, 74 S.Ct. 450, 98 L.Ed. 654, 655–656 (1954); Washington Gaslight Co. v. Connolly, 94 U.S.App.D.C. 156, 214 F.2d 254, 257 (1954); Wheaton v. United States, 133 F.2d 522 (8th Cir. 1943).