Hazel JACKSON, Appellant,

v.

STATE of Alaska, Appellee.

No. 5529.

Court of Appeals of Alaska.

Oct. 1, 1982.

William F. Morse, Asst. Public Defender, Kenai, and Dana Fabe, Public Defender, Anchorage, for appellant.

W. H. Hawley, Asst.Atty.Gen., Anchorage, and Wilson L. Condon, Atty.Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Hazel Jackson was charged with four counts of first degree murder for the shooting deaths of Georgette Watson and Danni Riggins. Former AS 11.15.010. Counts I and II charged killing with deliberate malice and counts III and IV charged shooting in the attempted perpetration of a robbery. In a jury trial before Anchorage Superior Court Judge Victor D. Carlson, Jackson was found guilty of Counts III and IV. Judge Carlson sentenced her to a term of life imprisonment on each count. Jackson now appeals to this court alleging various trial errors and arguing that her sentence is excessive. We affirm.

On the evening of August 24, 1977, Hazel Jackson and David Mills went to the apartment of Beatrice Risher, an elderly babysitter and friend of Jackson's, in order to steal heroin and money. Although frustrated in the attempt to steal anything, David Mills did shoot and kill Georgette Watson, age twenty-three, and Danni Riggins, age six. The facts as developed at trial through the testimony of Risher and Mills are as follows.

1. Although the nature of the relationship is unclear, Risher had known Jackson since 1974.

2. Two other children, ages three and four, were also present in the apartment, asleep in other rooms. They slept through the entire incident and were not harmed.

Mills testified that shortly after 5:00 on the afternoon of August 24, 1977, he and Hazel Jackson bought a bottle of tequila and shot some cocaine. At one point, Jackson asked Mills "how [he] felt about ripping some people off for some dope and some money." At first, Mills said he did not know, but when Jackson told him that it would only involve taking "a couple of pieces [ounces] of dope" [heroin] and $3,000 —$4,000 from an old lady, he agreed. Jackson then gave Mills a gun and told him that he could not leave any witnesses. She told him that when she gave the signal, he was to "open up." Mills agreed.

Risher and Mills gave different accounts of what happened at Risher's apartment. It is clear that when Jackson and Mills arrived and were let into the apartment,[1] Georgette Watson was seated on the sofa talking on the phone, and Danni Riggins was lying on the floor in her sleeping bag.[2] When Mills entered, he sat on the sofa next to Watson.

At this point, the accounts vary. Risher testified that Jackson went to the bathroom (which was apparently off of a bedroom) and that Risher sat on the end of a bed talking to Jackson while she was in the bathroom. They talked at first about a birthday party, and then Jackson said she "wanted two pieces of dope."[3] Risher testified that she then heard shots and that she reached under the bed and took a handgun out of a box and loaded five bullets into it. Mills then kicked open the bedroom door and put his gun in Risher's face. Risher, however, fired first and Mills fled the apartment without injury. Jackson then emerged from the bathroom and Risher told her to get out, which she did.

Mills told a different story.[4] He testified that he entered the apartment and sat

3. Apparently, there had in fact previously been some heroin in the apartment, but Risher had made a friend of Watson's take it away.

4. Mills had already pled guilty to two counts of second degree murder and had agreed to testify against Jackson. In return, the state dropped charges against him for possession of heroin, burglary, and forgery.

down on the sofa. After Jackson and Risher disappeared into a back room, he had Danni Riggins get him a glass of water which he drank while standing in the kitchen. After having stood in the kitchen for two or three minutes, Jackson returned to him and said just one word, "Now." He then shot at Georgette Watson who was sitting on the sofa, and when Danni popped up he fired at her. He then kicked in the bedroom door and saw Risher with a gun. He pointed his gun and tried to shoot, but it only clicked; Risher shot her gun and Mills fled to his car where he sat waiting for five minutes until Jackson joined him. Jackson asked Mills why he had not killed Risher and he explained that the gun would not fire. No more was said.

As her first point in this appeal, Jackson argues that the trial court should have granted a mistrial on the grounds that the prosecution created the implication that its key witness, David Mills, had taken and passed a lie detector test. This alleged implication was created under the following circumstances.

David Mills was called as a witness by the prosecution, and he testified to the circumstances of the murders as detailed above. In cross-examining Mills, defense counsel attempted to impeach Mills' credibility by establishing that he had agreed to implicate Jackson in exchange for the reduction of the charges against him. In this effort, defense counsel read excerpts from two police interviews of Mills. On redirect examination, the prosecution attempted to put Mills' statement to the police into context by reading extensively from one of the interviews. The significant portion which was read to the jury is as follows:

Q And you're telling us the truth because you want to?

A Right.

Q Has your attorney threatened you in any way to tell the truth?

A No.

Q Have I threatened you in any way?

A No.

Q How about the district attorney?

A No.

Q Anybody at the jail?

A No.

Q You're telling us the truth because you want to?

A Right.

Q Would you take a lie detector test as to what you're...

At this point, defense counsel objected and moved for a mistrial. Judge Carlson, however, merely instructed the jury to disregard the statement and stated that the objection and motion would be taken up later outside the presence of the jury. When the jury was excused, Judge Carlson heard argument from counsel and then asked the prosecution whether it was willing to stipulate that Mills did not take a polygraph. Following a lunch recess, the prosecution stated, "Your Honor, the state isn't willing to stipulate to that fact, simply because it's not true and I think it would be a misleading...." At this point, Judge Carlson denied the motion for mistrial, stating:

I do not believe that the mere fact that the polygraph was mentioned ... is cause for a mistrial since there was no evidence before the jury as to whether or not there was in fact a polygraph taken or refused nor of course any results concerning that polygraph and I immediately told the jury to disregard any reference to the polygraph.

In this appeal, Jackson now renews her challenge to this reference to a polygraph examination. We have examined the controlling case law, and we have concluded that Judge Carlson did not err in denying Jackson's motion for mistrial.

In *Pulakis v. State,* 476 P.2d 474, 479 (Alaska 1970), the Alaska Supreme Court explicitly set out the prevailing rule:

[T]he results of polygraph examinations should not be received in evidence over objection. Even if no objection has been tendered, the trial court ordinarily should reject such evidence.

This general rule had previously been expanded upon in dicta in *Gafford v. State,*

440 P.2d 405 (Alaska 1968), *cert. denied*, 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 125 (1969). There the court quoted from *Johnson v. State*, 166 So.2d 798, 805 (Fla.App. 1964), wherein it was said:

[T]he mere fact that the jury is apprised that a lie detector test was taken is not necessarily prejudicial if no inference as to the result is raised or *if* any inferences that might be raised as to the result are not prejudicial.

440 P.2d at 411. The *Gafford* court also quoted as follows from *People v. Martin*, 62 Ill.App.2d 798, 210 N.E.2d 798, 802 (1965):

The only remaining statements are those of Baum. They are not statements about the results of the test, but only about the fact that he took the test. . . . [W]e conclude that the trial court did not err in allowing Baum's statements that he took a lie detector test to go into evidence.

440 P.2d at 411.

■ The rule is straightforward: polygraph results may not be put before the jury either directly or by implication.[5] Therefore, the determinative question here is whether or not the interview excerpt read by the prosecution carried with it the implication that Mills had in fact taken and passed a polygraph test. Having reviewed the challenged statement in context, we do not think that it can be said that the impression was clearly created that Mills had either taken or passed a polygraph test.

While we recognize that in some cases, a mistrial might justifiably be granted upon the mere elicitation of a witness' willingness to take a polygraph test, we do not feel a mistrial was required in the instant case. Although the jury could have reasonably inferred an affirmative reply to the investigator's inquiry into Mills' willingness to submit to a lie detector test, we believe that, when viewed in context, the inference was unlikely to have resulted in any actual prejudice to Jackson. The question regarding the polygraph was merely one of many designed to elicit from Mills his assurance that he was telling the truth. This single reference to the polygraph was buried deep in the long excerpt of the interview read by the prosecution. Furthermore, the trial court's prompt admonition to the jury to disregard the statement was sufficient to cure any slight prejudice which may have resulted.[6] Accordingly, we hold that it was not error to deny Jackson's mistrial motion.

■ Jackson next raises a challenge to jury instruction number six relating to adoptive admissions. The instruction read:

Evidence has been presented that statements implicating the defendant by Mrs. Risher in the crimes charged in the indictment were made in the defendant's presence at a time when she was not under arrest or in custody and that such statements were neither denied, nor objected to by the defendant. If the jury finds that the defendant actually heard and understood the implicatory statements, and that they were made under such circumstances that the defendant could reasonably have been expected to have denied the statements if they were not true, then the jury should consider whether the defendant's silence was an admission of the truth of the statements.

Defense counsel objected at trial to this instruction on two grounds. First, he argued that Risher's words did not constitute

---

5. Basically, all of the cases cited by the parties in their briefs comprise variations on this theme. In her brief, Jackson cites *Crawford v. State*, 321 So.2d 559 (Fla.App.1975); *Stack v. State*, 234 Ga. 19, 214 S.E.2d 514 (1975); *State v. Davis*, 351 So.2d 771 (La.1977); *Robinson v. State*, 550 S.W.2d 54 (Tex.Cr.App.1977). As she notes, they are all reversals based on the improper admission of polygraph evidence. As the state notes in its brief, however, each involved evidence carrying a relatively clear inference that a prosecution witness had taken and passed a polygraph test.

6. In *Anderson v. State*, 438 P.2d 228, 233 n.15 (Alaska 1968), the court observed:

The "general rule" is that where the trial judge withdraws improper testimony from the jury's consideration, such an instruction is presumed to cure any error which may have been committed by its introduction. [Citations omitted.]

*See also Roth v. State*, 626 P.2d 583, 585 (Alaska App.1981).

a direct accusation of Jackson, and second, he argued that it was not clear either that Jackson heard Risher's words or that she understood those words to be accusatory. The court, however, ruled that the instruction would be read.

Jackson again challenges this instruction on appeal; however, she does so on grounds different from those raised below. Specifically, she argues the instruction is based on the erroneous premise that she responded to Risher's accusations with silence. Our review of the testimonial record indicates that Jackson is correct in her assertion that she did not remain silent in the face of Risher's accusations. At trial, Risher testified that after emerging from the bedroom and seeing the carnage wrought by Mills she said to Jackson, "Look what you've brought me. You caused him to kill up my family." Risher further testified that Jackson responded to these accusations by saying, "You all doing all this shooting."

Jackson concedes that since the specific objection to this instruction now raised in this appeal was not raised below, it must be reviewed here under the plain error standard. The standard of review of a challenged jury instruction under plain error was set out in *Evans v. State*, 550 P.2d 830, 843 (Alaska 1976):

> To constitute "plain error" the defect must be both obvious and substantial. The giving of an incorrect instruction should be recognized as plain error only when necessary to prevent a miscarriage of justice. The defect must have been obviously prejudicial. If it appears that failure to give defendant's proposed instruction did not contribute to the verdict, reversal is not required. [Citations omitted]

See also *Burke v. State*, 624 P.2d 1240, 1256 n.20 (Alaska 1980).

Applying this standard to the facts of this case, we do not believe that Jackson suffered "a miscarriage of justice." Two considerations lead us to such a conclusion. First, the challenged instruction did not misstate the facts by stating that Jackson responded to Risher's accusations with silence. The instruction merely charged that "Evidence has been presented that statements implicating the defendant by Mrs. Risher ... were neither denied, nor objected to by the defendant." It is well established that adoptive admissions need not be in the form of silence; evasive answers may suffice.[7] Since Jackson's response to Risher could be characterized as an evasion rather than a clear-cut denial, we conclude that the trial court did not commit plain error in placing the adoptive admission issue before the jury by means of the challenged instruction.

Our refusal to find plain error is also supported by the fact that it is apparent that the jury gave careful independent consideration to the adoptive admission issue and to the evidence relevant to that issue. After the jury had retired to deliberate, it sent a note to the court stating, "We need evidence presented in court pertaining to statement instruction number six." Pursuant to this request, the testimony of Mills and Risher was replayed. After listening to this testimony, the jury sent a second note to the court asking three questions on instruction number six: 1. "What evidence was presented?" 2. "Was the defendant in the presence of her counsel when the evidence was presented?" and 3. "Did Mrs.

---

7.    If a statement is made by another person in the presence of a party to the action, containing assertions of facts, which, if untrue, the party would under all the circumstances naturally be expected to deny, his failure to speak has traditionally been receivable against him as an admission. Whether the justification for receiving the evidence is the assumption that the party has intended to express his assent and thus has adopted the statement as his own, or the probable state of belief is to be inferred from his conduct is

probably unimportant. Since it is the failure to deny that is significant, an equivocal or evasive response may similarly be used against him on either theory, but if his total response adds up to a clear-cut denial this theory of implied admission is not properly available.

*Blue v. State*, 558 P.2d 636, 645 (Alaska 1977), *quoting*, C. McCormick, Law of Evidence § 270, at 651–52 (2d ed. 1972) (footnote omitted).

Risher know if Hazel Jackson knew if Mrs. Risher had a gun in the house?"

In response to this question, the court instructed the jury:

> Ladies and gentlemen, these are factual questions and are left solely for your determination. All the instructions are given which may apply, depending on what facts you find.[8]

Though these notes do suggest some confusion on the part of the jury, they also indicate that the jury was fully aware of the relevant evidence and that they carefully considered it with the clear understanding that it was their duty to determine both what Jackson said and what meaning could fairly be ascribed to her words.[9] Accordingly, we cannot accept Jackson's assertion that the challenged instruction improperly invaded the fact finding province of the jury. Therefore, we conclude that the reading of the challenged jury instruction did not constitute plain error.

As her next point on this appeal, Jackson raises the argument that the prosecution improperly vouched for its key witness, David Mills, during its closing statement to the jury. We see little merit to this contention.

In making his final statement to the jury, defense counsel argued that David Mills lied in implicating Jackson in order to save his own skin. Defense counsel further argued that Mills told these lies at the behest of the police officers interviewing him and that one of these officers, Investigator Rice, was more interested in making Mills appear truthful than in the truth itself.[10] The prosecution responded in its final argument with the following statement:

> [L]adies and gentlemen, he says, well, Rice is just setting up the record, well, may—it just may be, ladies and gentlemen, that Ron Rice was interested in the truth. Did that occur to you—to the defense counsel? Did it occur to defense counsel that the state is not interested in convicting people just to have a conviction, the state is interested in the truth? So he puts Major Vaden on trial and he puts Ron Rice on trial.

At this point, defense counsel objected, arguing that the prosecution was indirectly vouching for its witnesses. The court ruled: "The law is contained in the instructions. You may proceed to another part of your argument, Mr. Bundy."

In *Darling v. State,* 520 P.2d 793, 794 (Alaska 1974), the Alaska Supreme Court stated:

> [I]t is improper for a prosecuting attorney to express his personal belief as to the reliability of a witness, whether to

---

8. In addition, the court had already read the following instruction as part of its initial charge to the jury:

   > Neither by these instructions nor by any ruling or remark which I have made do I or have I meant to indicate any opinion as to the facts.

9. In refusing to find plain error, we are also influenced by the fact that even though the attention of the jury, court, and counsel was focused on the adoptive admission issue by means of the jury's inquiries, Jackson's counsel failed either to raise an objection on the grounds which he now raises or to request that the court more fully instruct the jury as to the relevant facts. Given the fact that such emphasis was placed on the adoptive admission issue as a result of the jury's inquiries, we do not think it unreasonable under the circumstances to conclude that counsel should have done more to bring his precise complaint to the attention of the court.

10. Defense counsel argued:

> At the risk of appearing corny, there is an extremely apt quotation from Shakespeare that covers what Investigator Rice was doing, or a characterization that could be made to what Investigator Rice was doing when he kept inserting, you're telling us the truth that no deals have been made. Referring to act 3, scene 2 from Hamlet in which the queen—or Hamlet asks, Madam, how like you this play? And the queen says, the lady doth protest too much me thinks. Well, how do I like that play that Investigator Rice was playing? I think he was protesting too much. For three pages, he's protesting how he's made no deal, there's no promises and this is going to be the truth, on and on and on. What's the purpose of that? It's to impress a jury when they get to trial. Do you think that's going to have the slightest effect on whether Mr. Mills is telling the truth or not? No. But, hopefully, from Mr. Rice's stand point, it will have an effect on you and I'd ask you that it not.

bolster the state's case or to discredit the credibility or reliability of defense witnesses. The vice sought to be guarded against by such a rule is the introduction into evidence of the unsworn testimony of counsel in which he states either explicitly or implicitly that his opinion as to the credibility of a witness is based upon personal knowledge of the witness. [Footnote omitted]

It is Jackson's contention that the prosecution's comments were so prejudicial as to require a reversal of Jackson's conviction. We are not persuaded.

 In the first place, we do not think the prosecution's comments must necessarily be read as vouching for the credibility of a witness. The prosecution's remarks were intended as a means of countering defense counsel's attack on Investigator Rice's motives. It appears the prosecutor was making the standard argument that the police have no motive to lie or to want to convict an innocent man.

Even if it may be concluded that the prosecution indirectly or impliedly vouched for Mills, we agree with the trial court that any error was cured by his admonition to the jury that, "The law is contained in the instructions." Specifically, we note that the jury was instructed as follows:

> Arguments, statements and remarks of counsel are intended to help you in understanding the evidence and applying the law, but are not evidence. If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark.

In this regard, we are influenced by the fact that in finding against the appellant's charge of improper vouching, the court in *Darling* remarked:

> We note that the superior court in its instruction to the jury informed them that the arguments of counsel were not evidence in the case, and that if counsel's arguments departed from either the facts or the law, they were to be disregarded.

*Id.* at 795 n.7.

Given the fact that the prosecution's comments during closing argument were argu-

ably not improper and since even if they were improper, any prejudice was cured by the trial court's admonition to the jury, we hold that a reversal of Jackson's conviction is not required.

 Lastly, Jackson argues that her life sentence is excessive because it does not reflect her potential for rehabilitation. We fail to find any merit in this argument. Besides her lengthy history of drug use, Jackson had previously been convicted of voluntary manslaughter for the stabbing death of a woman. In sentencing Jackson, Judge Carlson found her crime to be the worst type of offense, and he found her to be the worst type of offender, noting the cold blooded nature of the crime and her lack of remorse. We can find no basis upon which to dispute these conclusions. Accordingly, we hold that Judge Carlson was not clearly mistaken in imposing the sentence which he imposed.

The conviction and sentence are AFFIRMED.